**LEASEAMERICA CORPORATION,**
Plaintiff/Appellant,

v.

**NORWEST BANK DULUTH, N.A.,**
Defendant/Appellee.

**No. 90–5099MN.**

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 16, 1990.

Decided Aug. 1, 1991.

Raymond Hayward, Minneapolis, Minn., for plaintiff-appellant.

Raymond Erickson, Duluth, Minn., argued, for defendant-appellee, William

* The HONORABLE SUSAN WEBBER WRIGHT, United States District Judge for the Eastern District of Arkansas, sitting by designation.

Burns and Cheryl Richardson, Duluth, Minn., on the brief.

Before LAY, Chief Judge, FAGG, Circuit Judge, and WRIGHT,* District Judge.

SUSAN WEBBER WRIGHT, District Judge.

This is an appeal in a diversity case from a judgment entered for Norwest Bank Duluth, N.A., by the District Court from the District of Minnesota.[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1291. We affirm.

This controversy centers on the dishonor by Norwest (the Bank) of a $200,000 letter of credit issued by the Bank on application of the bank's customer, Duluth Bowling Center Limited Partnership (DBC) to the benefit of LeaseAmerica. The letter was secured by a $200,000 certificate of deposit which was financed by DBC through a loan from the Bank. The letter of credit was to guarantee lease payments owed by DBC to the beneficiary, LeaseAmerica. It was dated June 1, 1987, was entitled "Irrevocable Standby Letter of Credit Number 87–14," and specifically stated that it was subject to the 1983 Revision of the Uniform Custom and Practice for Documentary Credits (UCP). The letter provided that drafts in compliance with it would be "paid if negotiated and presented at [the Bank's] counters on or before May 31, 1988." It required the Bank to pay a draft accompanied by the following documents:

An affidavit by an authorized officer of LEASEAMERICA CORPORATION that (1) a condition of default as to lease payments required under that Lease Agreement dated April 29, 1987, by and between LEASEAMERICA CORPORATION and DULUTH BOWLING CENTER LIMITED PARTNERSHIP (the "Lease Agreement") arose by an event of default as to lease payments as provided in the Lease Agreement occurring at lease [sic] ten (10) days prior to the

1. The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

date of the submission of the draft; (2) written notice of such condition of default was delivered to DULUTH BOWLING CENTER LIMITED PARTNERSHIP at its principal business office at least ten (10) days prior to the date of the submission of the draft; and (3) said condition of default has not been cured and continues as of the date of the submission of the draft.

Pertinent parts of the 1983 version of the UCP include Article 16, Paragraph (c), which gives the issuing bank a reasonable time to determine whether to take up or refuse the documents. Paragraph (d) requires the issuing bank to give notice of refusal "without delay, by telecommunication" if such is possible and further requires that the notice of refusal state discrepancies that are the basis of the refusal. That paragraph also requires that the notice state whether the bank is holding the documents or is returning them to the presenter. Paragraph (e) states that the bank is precluded from claiming that the documents are not in conformance with the letter of credit if it fails to act in accordance with paragraphs (c) and (d).

On May 31, 1988 (the expiration date of the letter of credit), an agent for LeaseAmerica submitted to the Bank a draft along with all of the documents required for payment except an affidavit asserting that DBC had been given notice of default at least ten days' prior to the date of submission. In lieu of this ten days' notice requirement, LeaseAmerica presented the Bank with an affidavit from DBC stating that DBC waived the ten days' notice requirement. On June 2, 1988, an agent of the Bank telephoned an agent of LeaseAmerica, Rob Marwick, to notify LeaseAmerica that the Bank was dishonoring the draw. Mr. Marwick apparently was unavailable and returned the call on June 3. On June 2 the Bank notified LeaseAmerica of the dishonor by overnight mail. The reason given for dishonor was the failure of LeaseAmerica to give DBC ten days' written notice of default.

LeaseAmerica sued the Bank, and both parties filed motions for summary judg-

ment. The lower court entered summary judgment for the Bank, and LeaseAmerica appeals. LeaseAmerica asserts that the proper standard for determining compliance under a letter of credit is substantial compliance, not strict compliance, and that its compliance with the terms of the letter of credit was substantial. Also with respect to compliance, LeaseAmerica argues that the lower court improperly applied the doctrine of strict compliance to LeaseAmerica but applied the doctrine of substantial compliance to the Bank. LeaseAmerica further asserts that the district court erred in concluding that the ten days' notice provision was for the benefit of both the Bank and DBC and could not be waived by DBC alone. Finally, LeaseAmerica contends that the lower court erred by entering summary judgment for the Bank because there are genuine issues of material fact.

The standard governing summary judgment is clear. A party is entitled to summary judgment only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P.* 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must view all inferences to be drawn from the facts in a light most favorable to the party opposing the motion. *Wabun–Inini v. Sessions,* 900 F.2d 1234 (8th Cir. 1990). Summary judgment is a question of law to be reviewed *de novo. Spalding v. Agri–Risk Services,* 855 F.2d 586, 588 (8th Cir.1988).

I. The Ten Days' Notice Provision

Perhaps the most critical issue in this controversy is the effect of the requirement in the letter of credit that ten days' written notice of default be given to DBC. This requirement was waived by DBC but not by the Bank.

LeaseAmerica notes that in the application for the letter of credit, which the Bank drafted, the parties provide that DBC could give the Bank "contrary instructions in writing," and that their written waiver of the notice provision constituted such instructions. We do not construe this provision in the application as permitting DBC

to alter the terms of the letter of credit between the Bank and LeaseAmerica.

 LeaseAmerica contends that the ten days' notice requirement was for the benefit of DBC and points out that an agent for the Bank admitted this in a deposition.[2] The Bank argues that the letter of credit is a contract between it and LeaseAmerica which may not be modified by DBC. We acknowledge authority that a letter of credit is not a contract. *See, e.g.,* John F. Dolan, *The Law of Letters of Credit* ¶ 2.02 at 2–5 (Warren, Gorham & Lamont, 2d ed. 1991); Comment, *Letters of Credit: A Solution to the Problem of Documentary Compliance,* 50 FORDHAM L.REV. 848, 854 (1982). Whatever the characterization of the letter of credit, we agree that LeaseAmerica and DBC could not modify its terms without the Bank's consent if the modification materially affected the Bank's obligation.

The letter of credit unambiguously requires that DBC be given ten days' written notice of default prior to submission of the draft. This means that under the terms of the letter of credit, written notice of default must be given DBC no later than ten days prior to the expiration date of the letter of credit, May 31, 1988. The attempted modification of that term would materially affect the Bank's obligation under the credit.

The UCP supports our position. Article 10(d) of the 1983 version of the UCP provides that an irrevocable credit may not be amended "without the agreement of the issuing bank, the confirming bank (if any), and the beneficiary."[3] Although the parties did not cite this provision in their briefs and it is nowhere in the record, we note that it, along with other provisions of the 1983 UCP, is incorporated by reference in the letter of credit itself.

II. The Standard for Compliance with the Terms of the Credit

 Having determined that the waiver of notice by DBC was not effective to modify the agreement between the Bank and LeaseAmerica, we must now address LeaseAmerica's arguments concerning the lower court's ruling on the standard of compliance required for parties to a letter of credit. Minnesota law applies to this case, but the parties have cited us no authority in point and we have found none. However, the weight of authority favors a rule requiring strict compliance with the terms of a letter of credit, *see, e.g. Venizelos, S.A. v. Chase Manhattan Bank,* 425 F.2d 461 (2d Cir.1970); *Insurance Company of North America v. Heritage Bank, N.A.,* 595 F.2d 171 (3d Cir.1979); *Chase Manhattan Bank v. Equibank,* 550 F.2d 882 (3d Cir.1977); *Courtaulds North American, Inc. v. North Carolina National Bank,* 528 F.2d 802 (4th Cir.1975); *Philadelphia Gear Corp. v. Central Bank,* 717 F.2d 230 (5th Cir.1983); *Bossier Bank and Trust Co. v. Union Planters National Bank,* 550 F.2d 1077 (6th Cir.1977); *Board of Trade v. Swiss Credit Bank,* 728 F.2d 1241 (9th Cir.1984); *American Airlines, Inc. v. Federal Deposit Ins. Corp.,* 610 F.Supp. 199 (D.C.Kan.1985); *Armac Industries, Ltd. v. Citytrust,* 203 Conn. 394, 525 A.2d 77 (1987); *Kelly–Springfield Tire Co. v. Dakota Northwestern Bank, N.A.,* 321 N.W.2d 516 (N.D.1982); *Ronald A. & Caroline Olson, Inc. v. United States Nat. Bank,* 70 Or.App. 460, 689 P.2d 1021 (1984), and we adopt that rule. Adoption of a substantial compliance standard would place issuing banks in uncertain positions with respect to their obligations. In this case LeaseAmerica argues that it substantially complied because it presented a waiver of the ten days' notice requirement by DBC, the party for whom the notice provision was included. However, if this court were to adopt this standard, the issuing bank would be required to apply a legal or commercial analysis, often without benefit of professional advice, in every situation in which compliance was colorably "substan-

---

2. Partial deposition transcript of Rob Marwick, Appellant's Appendix at 42.

3. See John F. Dolan, *The Law of Letters of Credit* ¶ 6.06[3] at 6–65 (Warren, Gorham & Lamont, 2d ed. 1991) for a discussion of this provision.

tial." We believe that this would burden an issuing bank unduly and would fetter the commercial purposes of the letter of credit.[4] Adoption of a substantial compliance standard on grounds that the result will more likely meet the parties' expectations might also erode the principle that a letter of credit is independent of contracts between the bank's customer and the beneficiary. *See, e.g., Prudential Insurance Co. v. Marquette National Bank,* 419 F.Supp. 734, 736 (D.Minn.1976) (letter of credit is independent of the agreement between the customer and beneficiary).

Having adopted the strict compliance standard, we must now determine whether the district court erred by applying a less rigorous "substantial" compliance standard to the conduct of the Bank. Similarly, we must determine whether the terms of the 1983 revision of the UCP preclude the Bank from dishonoring the draw, as counsel for LeaseAmerica contended at oral argument.

LeaseAmerica argues that the Bank did not comply with two requirements of Article 16(d) of the UCP, as it did not convey its notice of dishonor by telecommunication, although both the Bank and LeaseAmerica had facsimile machines, and it did not notify LeaseAmerica whether it was holding the documents or returning them. With regard to the requirement of notice by telecommunication, we agree with the District Court that the Bank fulfilled this requirement when it telephoned LeaseAmerica to give notice of the dishonor.[5] We therefore find that failure to notify by facsimile machine was not a violation of the UCP.

There is no dispute that the Bank did not notify LeaseAmerica whether it was holding or returning the documents. We hold that failure to so notify LeaseAmerica does not preclude the Bank from dishonor, as the defect was incurable. LeaseAmerica cannot avoid the adverse results of an incurably defective compliance by invoking a strict compliance standard to the conduct of the Bank or by applying the provisions of the UCP.

Our analysis requires careful consideration of Article 16(e) of the UCP, which reads as follows:

> If the issuing bank fails to act in accordance with the provisions of paragraphs (c) and (d) of this article and/or fails to hold the documents at the disposal of, or to return them to, the presenter, the issuing bank shall be precluded from claiming that the documents are not in accordance with the terms and conditions of the credit.

LeaseAmerica contends that this provision unambiguously provides that the Bank is precluded from dishonoring the draw, as the Bank did not follow the requirements in paragraph (d) that notice of refusal of the documents be sent by telecommunication, if possible, and that the notice state whether the issuing bank is holding the documents or returning them.[6] We have already held that the Bank met the requirement that the notice be given by telecommunication. Yet it did not state in its notice whether it was holding the documents or returning them.

The language of this article does not specifically address the timeliness of the presentment. We believe that this language was included in the UCP to give a beneficiary a chance to cure a curable de-

---

**4.** "In short, the substantial compliance standard is not standard at all. It is an invitation to controversy. It promotes dispute. It is anathema to the effective functioning of a marvelous commercial device. It transforms the quick, efficient, inexpensive letter of credit into the lumbering, expensive performance bond." Dolan, *Strict Compliance with Letters of Credit: Striking a Fair Balance,* 102 BANKING L.J. 18, 28 (1985).

**5.** In a publication explaining the differences between the 1974 and 1983 revisions of the UCP, the International Chamber of Commerce has

noted that the word "telecommunication" was adopted in Article 16 of the 1983 revision "because of the practice of sometimes advising refusal by a properly authenticated telephone call." *UCP 1974/1983 Revisions Compared and Explained—Documentary Credits* at 32 (ICC Publishing Corporation, 1984).

**6.** LeaseAmerica also asserts in its appellate brief that it does not know whether the Bank continued to hold the documents. Yet in its reply brief it acknowledges that the Bank returned all of the original documents submitted except one, which was apparently a copy.

fect, not to require the issuing bank to honor an untimely presentment. The presentment by LeaseAmerica was untimely and incurable.

Other courts applying the preclusion provisions of Article 16 indicate that the reason for these provisions is to give the beneficiary an opportunity to cure. For example, in *Offshore Trading Co. v. Citizens National Bank,* 650 F.Supp. 1487 (D.Kan. 1987), the court commented that the reason for the requirements of Article 16 is "to give the beneficiary notice of the discrepancies in order to allow it to correct the documentation.... As a result, if the Bank failed to give notice of any nonconformity other than failure to provide the reciprocal letter of credit, it is precluded from doing so now." *Id.* at 1491. Similarly, in *Datapoint Corp. v. M & I Bank,* 665 F.Supp. 722 (W.D.Wis.1987), the court applied the preclusion of Article 16 to an issuing bank that had failed to give notice "without delay by telecommunication" of its dishonor of a presentment one day before the expiration date. Instead of using telecommunication, the issuing bank had sent notice by mail. The court found that "[c]ommon experience would have suggested that it was unlikely that Colonial would receive this notice in time to correct the variance ..." *Id.* at 727. Unlike our situation, these cases involved timely presentment of documents with curable defects.

### III. Appropriateness of Summary Judgment

 Finally, LeaseAmerica argues that we should not grant summary judgment because material issues of fact remain, namely, whether LeaseAmerica knew that its draw was non-conforming and whether the Bank misled it into believing that the letter of credit would be extended beyond May 31, 1988. We find that there are no material issues of fact with respect to these issues. LeaseAmerica submitted a waiver, an action which would be necessary only if its draw was non-conforming. The deposition of Mr. Thomas P. Barber, upon which LeaseAmerica relies for its argu-

ment that it was misled by the Bank, indicates that no representative of the Bank made this statement (Deposition at p. 66). Mr. Barber indicated that agents of DBC made this representation. We note that the Bank is not bound by statements attributed to the agents of DBC. We also note that the bank officer's notes, upon which LeaseAmerica also relies for its contention that the Bank indicated that it would extend the letter of credit beyond the expiration date, do not indicate that the Bank had made such a representation.

### IV. Conclusion

It might be possible to conclude that in a situation such as this it is unfair to permit the issuing bank to escape its obligation on a provision such as the ten days' notice of default provision at issue herein. After all, it is clear from the record that it would not be in the best financial interest of the Bank to honor the draft. In decisions such as this we must balance our general sense of what is "fair" under particular circumstances with the public policy of promoting a commercially efficient marketplace. However, we find that the strict compliance standard is not unfair:

> Courts in this area are not dealing with widows and orphans.... There is no reason to bend the law of credits out of shape and to destroy an efficient commercial device to protect careless, less than diligent professionals. If they do not know the rules, let them eat the cake of compliance.[7]

Accordingly, we affirm.

---

7. Dolan, *supra* note 4, at 29.