**TOYOTA TSUSHO CORPORATION, a Japanese corporation, Plaintiff,**

v.

**COMERICA BANK, a Michigan banking corporation, Defendant.**

**No. 95–71642.**

United States District Court,
E.D. Michigan,
Southern Division.

July 1, 1996.

Allan L. Gropper, White & Case, New York City, Kenneth J. McIntyre, K. Scott Hamilton, Dickinson, Wright, Moon, Van Dusen & Freeman, Detroit, Michigan, for Plaintiff.

Gregory L. Curtner, Kathryn L. Ossian, Miller, Canfield, Paddock & Stone, Detroit, Michigan, for Defendant.

## *OPINION*

GILMORE, District Judge.

This case involves a dispute over a letter of credit ("LOC") between plaintiff Toyota Tsusho Corporation ("Toyotsu"), the beneficiary of the LOC, and defendant Comerica Bank ("Comerica"), the issuer of the LOC. Before the court are cross-motions for summary judgment, based on stipulated facts filed with the court by the parties. For the reasons set forth below, plaintiff's motion for summary judgment is granted and defendant's motion for summary judgment is denied.

## I. *FACTS*

Plaintiff Toyotsu manufactures CD–ROM units. The LOC involved in this dispute was obtained by Toyotsu to cover sales of its CD–ROMs to a San Francisco corporation called Media Vision, Inc. ("Media Vision"). Following the dispute over this LOC, on July 25, 1994, Media Vision filed for bankruptcy under Chapter 11. Toyotsu filed a timely proof of claim in that bankruptcy case.

Jurisdiction in this case is based on diversity pursuant to 28 U.S.C. § 1332, as Toyotsu is a Japanese corporation with its principal place of business in Japan, and Comerica is a Michigan corporation with its principal place of business in Michigan. The amount in controversy is over $1,000,000 and clearly satisfies the jurisdictional requirements of this court.

At a scheduling conference conducted by the court on August 8, 1995, the parties

stated their intentions to file cross-motions for summary judgment, along with stipulated facts, in hopes of resolving this matter without a trial. The undisputed facts in the case are as follows:

On or about October 25, 1993, defendant Comerica issued an irrevocable LOC, Documentary Credit No. 25615, in favor of the beneficiary, plaintiff Toyotsu, for the account of Media Vision, the applicant. This LOC was issued in conjunction with a $50 million revolving line of credit that was issued to Media Vision by Comerica and the First National Bank of Boston. The LOC was issued to cover sales of 10,000 units of Toyotsu's CD–ROM drives to Media Vision. The LOC required that the following specific documents be presented by Toyotsu for each draw on the LOC:

> AIR WAYBILLS CONSIGNED TO MEDIA VISION INC DATED NOT LATER THAN 94/02/07 MARKED "FREIGHT PREPAID". + SIGNED COMMERCIAL INVOICES IN ORIGINAL AND 02 COPIES CERTIFYING THAT MERCHANDISE IS IN ACCORDANCE WITH MEDIA VISION'S PURCHASE ORDER NO. MV5302. + PACKING LIST IN 03 COPIES.

The original expiration date on the LOC was February 28, 1994. The parties agreed that the LOC and all amendments would be governed by the Uniform Customs and Practice for Documentary Credits ("UCP") and by Michigan law. *See* THE UNIFORM CUSTOMS AND PRACTICE FOR THE DOCUMENTARY CREDITS (1983 Revision), INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NUMBER 400 ("UCP 400").[1]

### A. *Amendments to LOC*

A series of amendments were made to the LOC by Comerica. On or about November 26, 1993, Comerica issued Amendment No. 01 to the LOC. Among other things, Amendment No. 01 changed the LOC's expiration date to January 31, 1994; set the "Latest Date of Shipment" at December 31, 1993; and extended the "Presentation Period" by providing: "DOCUMENTS TO BE PRESENTED WITHIN 031 DAYS AFTER THE ISSUANCE OF THE SHIPPING DOCUMENTS BUT WITHIN THE VALIDITY OF THE CREDIT." Amendment No. 01 also increased the amount of Credit from $1,155,000 to $3,909,100 and the number of CD–ROM Drive units covered by the Credit by 33,000.

On or about December 27, 1993, Comerica issued Amendment No. 02 to the LOC. Among other things, Amendment No. 02 changed the expiration date to April 21, 1994, and extended the "Latest Date of Shipment" from December 31, 1993 to March 31, 1994. Amendment No. 02 further increased the amount of the Credit to $6,279,000 and increased the number of CD–ROM Drive units covered by the Credit by 23,000. One part of Amendment No. 02 relevant to this controversy reads:

> **THE LATEST DATE OF SHIPMENT IS NOW 3/31/94. THIS LETTER OF CREDIT IS BEING INCREASED TO COVER AN ADDITIONAL 23,000 UNITS.** (Emphasis added).

On or about January 21, 1994, Comerica issued Amendment No. 03 to the LOC. This amendment is particularly relevant to this law suit as it expanded the list of documents acceptable for presentment on a draw. It provides:

> + AIR WAYBILLS CONSIGNED TO MEDIA VISION INC. DATED NOT LATER THAN 94/02/07 MARKED "FREIGHT PREPAID". **FORWARDERS BILL OF LADING OR OCEAN BILL OF LADING CONSIGNED TO MEDIA VISION INC., MARKED "FREIGHT PREPAID" ARE ACCEPTABLE.** (Emphasis added).

Amendment No. 04 to the LOC, issued on or about January 28, 1994, increased the

---

1. In their cross motions for summary judgment, the parties have relied primarily on the 1983 version of the UCP, known as the UCP 400, which was in place when this LOC was first issued. However, in some instances, the parties have cited the 1993 revisions to the UCP, known as the UCP 500. Because no material changes to the sufficiency of notice requirement were made in the 1993 revisions, the court's decision will be based on the UCP provisions relied upon by the parties.

amount of the Credit to $9,791,200 and the number of CD–ROM units covered by the Credit by 90,000. Amendment No. 05, issued on or about March 11, 1994, increased the amount of Credit to $14,233,100, and the number of CD–ROM units by 43,000.

## B. *Presentments Under the LOC*

Between January 20, 1994, and April 5, 1994, Comerica received multiple presentments of documents under the LOC from plaintiff Toyotsu. These documents were presented by the Tokai Bank, Limited ("Tokai"), which was acting as the negotiating bank on behalf of Toyotsu. Each presentment was accompanied by certain documents, including: (1) a document entitled "Invoice"; (2) a document entitled "Bill of Exchange"; (3) an "Insurance Policy"; and (4) a packing list. Also included with each presentment was some kind of transportation document, such as a "Multimodal Transport Bill of Lading" or an "Air Waybill" issued by a transportation company reflecting the date of a CD–ROM shipment to Media Vision. After reviewing the documents presented, Comerica made payments to Tokai bank on plaintiff's behalf. During this time period, millions of dollars were paid to plaintiff from defendant under the LOC.

This lawsuit arises from a dispute over four presentments under the LOC based on shipments occurring between March 23 and March 29, 1994 ("the March, 1994 shipments"). The relevant facts surrounding these shipments and presentments are as follows:

On March 23, 1994, plaintiff shipped, via air, 5,292 units of CD–ROM drives with a purchase price of $546,663.60 to Media Vision. That shipment was labeled batch number "BB 620–22477." On March 25, 1994, plaintiff shipped, via air, 4,380 units of CD–ROM drives with a purchase price of $452,454.00 to Media Vision. That shipment was labeled batch number "BB 620–22770." On March 26, 1994, plaintiff shipped, via air, 2,340 units of CD–ROM drives with a purchase price of $241,722. That shipment was labeled batch number "BB 620–22769." Finally, on March 29, 1994, plaintiff shipped, via air, 7,308 units of CD–ROM drives with a

purchase price of $754,916.40. That shipment was labeled batch number "BB 150–21715."

Between April 6 and April 12, 1994, Comerica received four separate presentments of documents for each of the March 23, 25, 26 and 29, 1994 shipments to Media Vision. Each presentment included the following documents: (1) a document entitled "Invoice"; (2) a document entitled "Bill of Exchange"; (3) an Insurance Policy; (4) a transport document entitled "Air Waybill," issued by Kintetsu World Express, Inc.; and (5) a "Packing List."

## C. *Comerica's Rejection of the Presentments*

On April 11, 1994, Comerica notified Tokai by telex that Comerica was rejecting the April 6, 1994 draw for batch number BB 620–2247 (the March 23, 1994 shipment). The notice stated: "APPLICANT HAS REJECTED DOCUMENTS DUE TO LATE SHIPMENT." On April 14, 1994, Comerica notified Tokai by telex that it was rejecting the presentment under the LOC for batch numbers BB620–22770 and 22769 (the March 25 and 26 shipments). This notice stated: "DOCUMENTS REJECTED BY APPLICANT DUE TO LATE SHIPMENT." Also on April 14, 1994, Comerica notified Tokai by telex that it was rejecting the draw on a batch number erroneously identified as "BB 150–51715." This notice also stated: "DOCUMENTS REJECTED BY APPLICANT DUE TO LATE SHIPMENT."

On April 15, 1994, Tokai bank sent a telex to Comerica on plaintiff's behalf requesting clarification of the reason for rejection of the presentment documents on batch number "BB150–51715" (which had been erroneously identified as "BB 150–5175" in Comerica's April 14, 1994 rejection notice). On the same day, Comerica replied by telex, correcting its reference to batch number BB150–21715 (the March 29 shipment), and stating: "PLEASE REFER TO OUR AMENDMENT NO. 3 DD 21 JAN 94 WHICH STATES 'AIRWAY BILLS ... DATED NOT LATER THAN 07 FEB 94'. THEREFORE, DOCUMENTS RETURNED TO YOU ON 14FEB94."

After April 15, 1994, Tokai assigned any rights it may have had as a negotiating bank under the LOC to Toyotsu. Toyotsu holds the original LOC, all original amendments thereto, and the original sight drafts. On April 21, 1994, the LOC expired on its own terms. Comerica has never paid Toyotsu for any of the four draws at issue here. The total unpaid amount is $1,995,756, which is the amount claimed in Toyotsu's amended complaint, and the amount of Toyotsu's proof of claim in the Media Vision bankruptcy suit, which was filed on or about July 25, 1994.

## II.

Following Comerica's refusal to pay Toyotsu for the four March, 1994 draws, Toyotsu filed a four-count complaint in this court. The third and fourth counts were withdrawn when Toyotsu's motion for summary judgment was filed, leaving the following two claims: (1) that Comerica wrongly refused to honor the four conforming draws for the March 23, 25, 26 and 29, 1994 shipments under the LOC; and (2) that Comerica failed to give timely and sufficient notice of any valid discrepancy in the draws, thereby precluding Comerica from asserting any other discrepancy as a basis for dishonor.

In Comerica's response and cross-motion for summary judgment, Comerica argues: (1) that the documents presented to Comerica on behalf of Toyotsu for the draws on the March shipments did not comply with the express terms of the LOC; and (2) that Toyotsu received timely and sufficient notice of Comerica's rightful rejection of those draws.

This court is presented with two distinct issues on these cross-motions for summary judgment, the first being whether the presentment documents for the four March shipments conformed to the LOC, and the second being whether Comerica is precluded from rejecting the draws for failing to provide plaintiff with sufficient notice of its reasons for rejection.

### A. *Summary Judgment Standard*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A fact is "material" and precludes grant of summary judgment "if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984). The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See Bender v. Southland Corp.*, 749 F.2d 1205, 1210–11 (6th Cir.1984).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). This burden may be discharged by showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg*, 801 F.2d at 861. However, a nonmovant must do more than raise some doubt as to the existence of a fact; the nonmovant must produce evidence that would be sufficient to require submission of the issue to the jury. *Lucas v. Leaseway Multi Transp. Serv. Inc.*, 738 F.Supp. 214, 217 (E.D.Mich.1990), *aff'd*, 929 F.2d 701 (6th Cir.1991). This evidence need not be the sort admissible at trial, but must be more than the nonmovant's own pleadings and affidavits. *Ashbrook v. Block*, 917 F.2d 918, 921 (6th Cir.1990).

### B. *LOCs and the Strict Compliance Rule*

Before addressing the complex issues raised in this case, some background on LOCs may be useful. A LOC is a contract between a bank and a beneficiary of credit that is separate and distinct from the commercial contract between the beneficiary

(usually a seller), and the bank's customer (usually a buyer). The LOC is not dependent upon the underlying commercial transaction, and in determining whether to pay, the bank looks only at the LOC and the documentation presented by the beneficiary to determine whether it meets the LOC's requirements.

▮ The majority view, which has been expressly adopted by Michigan courts, is a standard of "strict compliance" with a LOC's presentment requirements. *See Osten Meat v. First of America*, 205 Mich.App. 686, 517 N.W.2d 742 (1994). "This standard leaves no room for documents which are almost the same, or which will do just as well." *Id.* at 690, 517 N.W.2d 742. The purpose behind this "strict compliance" standard is to promote the predictability and swiftness of a determination to honor or dishonor a draw request on an LOC and to make the processing of LOCs more efficient. *Id.* at 691–92, 517 N.W.2d 742.

### C. *Plaintiff's Compliance with the LOC*

▮ The first issue before the court in this case is whether the transport documents submitted by plaintiff with its draws on the four March, 1994 shipments strictly complied with the LOC. In its defense to this law suit, Comerica argues that the LOC required presentment of "AIR WAYBILLS CONSIGNED TO MEDIA VISION INC. DATED NOT LATER THAN 94/02/07" and that Toyotsu failed to comply with this requirement when it submitted documents entitled "air waybills" dated after February 7, 1994.

In arguing that its presentments complied with the LOC's express terms, plaintiff relies on Amendment No. 3 to the LOC, which expanded the list of acceptable presentment documents and provided that "FORWARDERS BILL OF LADING OR OCEAN BILL OF LADING CONSIGNED TO MEDIA VISION INC., MARKED 'FREIGHT PREPAID' ARE ACCEPTABLE." Plaintiff argues that the transport documents presented for the March, 1994 shipments were "forwarders bills of lading." Although each document was labeled "air waybill," plaintiff contends that "air waybill" is a narrow term falling within the broad definition of "for-warders bill of lading." Defendant contests this broad construction of the term, asserting that "air waybills" and "forwarders bills of lading" are separate and distinct transport documents.

Each party has defended its interpretation of these terms by citing conflicting definitions from various sources, leaving the court no choice but to characterize the term as ambiguous. The parties also present conflicting versions of the intent behind Amendment No. 03 to the LOC, which is relevant to the court's determination about how broadly the ambiguous term "forwarder's bill of lading" should be interpreted.

The court believes that the stipulated facts presented by the parties are insufficient to resolve all genuine disputes of fact relevant to determining whether an "air waybill" is a "forwarders bill of lading" under this LOC. This dispute is clearly material because if an "air waybill" is not a "forwarders bill of lading," then Toyotsu's presentment documents failed to conform with the LOC because they were dated after February 7, 1994. However, if an "air waybill" is a "forwarders bill of lading," then Toyotsu complied strictly to the terms of LOC Amendment No. 03 and its draws on the March, 1994 shipments should have been honored. Because this issue cannot be resolved based on the stipulated facts presented by the parties, the court is not in a position to resolve the cross-motions for summary judgment on this ground.

### D. *"Strict Preclusion" Notice Requirement*

▮ However, resolution of these cross-motions does not necessarily require that this court determine whether Toyotsu strictly complied with the LOC's provisions. Toyotsu has argued that even if the air waybills presented on the four March shipments were not "forwarder's bills of lading" conforming to the LOC, Comerica is precluded from rejecting the draws because the bank failed to provide proper notice about the reasons for its rejection.

It is undisputed that the initial notices Comerica provided to Toyotsu when it dishonored the four March presentments gave

one of the following reasons for rejection: "DOCUMENTS REJECTED BY APPLICANT DUE TO LATE SHIPMENT" or "APPLICANT HAS REJECTED DOCUMENTS DUE TO LATE SHIPMENT." Toyotsu argues that these rejections were wrongful because under Amendment No. 2 to the LOC, the "Latest Date for Shipment" was March 31, 1994, and the parties have stipulated that Toyotsu made all four CD-ROM shipments to Media Vision prior to March 31, 1994. Under these circumstances, Toyotsu argues that it is entitled to judgment against Comerica as a matter of law for $1,995,756, the amount of the unpaid draws.

In response to this argument, Comerica asserts that its notice was both timely and legally sufficient and provides no grounds for waiver. Defendant asserts that under the current version of the UCP, as amended in 1993, a timely notice must be received by the beneficiary within seven banking days following the bank's receipt of the documents. *See* UCP 500, Art. 14(d)(i) (1993). Here, it is undisputed that Comerica received the four presentments between April 6 and April 12, 1994. It is also undisputed that Toyotsu received notice of rejection of the presentments within this seven-day time frame, on April 11 and April 14, 1994.

Comerica also argues that its original notices were sufficient. No Michigan court has addressed sufficiency of notice under the UCP, which provides that the notice "must state all discrepancies in respect of which the bank refused the documents." UCP 400, Art. 16(d). Comerica argues that the proper standard for evaluating notices is whether any discrepancies were sufficiently described. In this case, the rejection notices telexed to Toyotsu read: "APPLICANT HAS REJECTED DOCUMENTS DUE TO LATE SHIPMENT" or "DOCUMENTS REJECTED BY APPLICANT DUE TO LATE SHIPMENT." Comerica asserts that these telexes sufficiently communicated to Toyotsu that the dishonor was based on non-conforming transport documents. Because the only transport documents presented by Toyotsu were the air waybills, Comerica asserts that its telexes adequately informed Toyotsu that the air waybills presented were late.

Defendant also relies on its response to a request for clarification from Toyotsu on April 15, 1994, to which Comerica responded that same day with a telex stating: "PLEASE REFER TO OUR AMENDMENT NO. 3 DD 21 JAN 94 WHICH STATES 'AIRWAY BILLS ... DATED NO LATER THAN 07 FEB 94'." Both plaintiff's request and defendants' response referred specifically to the draw identified as BB150–21715 (the March 29 shipment). When this clarification telex is considered together with Comerica's original notices, Comerica asserts that sufficient notice was given to plaintiff about the reason for dishonor of the March, 1994 draws.

Plaintiff disagrees, and argues that the court should adopt a "strict preclusion" notice requirement under the UCP and find that the initial notices sent to Toyotsu by Comerica was insufficient to meet the UCP's requirements, thereby precluding Comerica from presenting valid reasons for dishonoring the draws at this time. Because neither the Sixth Circuit nor any Michigan court has addressed the specificity of notice required or the consequences of failure to provide sufficient notice under the UCP, the court will rely on the language of the UCP itself, as well as looking to decisions from other courts for guidance.

The UCP provisions relevant to this case are Article 16(c), (d) and (e), which provide:

(c) The issuing bank shall have a reasonable time in which to examine the documents and determine, as above, whether to take up or refuse the documents.

(d) If the issuing bank decides to refuse the documents, it must give notice to that effect, without delay, by telecommunication or, if that is not possible, by other expeditious means, to the bank from which it received the documents (the remitting bank), or to the beneficiary if it received the documents directly from him. **Such notice must state the discrepancies in respect of which the issuing bank refuses the documents** and also must state whether it is holding the documents at the disposal of, or is returning them to, the presenter (remitting bank or beneficiary as the case may be). The issuing bank then

shall be entitled to claim from the remitting bank refund of any reimbursement that may have been made to that bank.

(e) If the issuing bank fails to act in accordance with the provisions of paragraphs (c) and (d) of this article and/or fails to hold the documents at the disposal of, or to return them to, the presenter, the issuing bank **shall be precluded from claiming that the documents are not in accordance with the terms and conditions of the credit.**

UCP 400, Art. 16(c), (d), (e) (1983).

Many courts have interpreted UCP Article 16(e) to mean that an issuing bank is estopped from asserting valid grounds for dishonor under a LOC if it fails to adequately fulfil the notice requirements of Article 16(d).

In *Kerr–McGee Chemical Corp. v. FDIC*, 872 F.2d 971 (11th Cir.1989), the Eleventh Circuit held that "[t]he controversy here does not involve the validity of [the bank's] grounds for dishonoring the draft, but rather whether [the bank] was estopped from relying on ... valid grounds." *Id.* at 973. Similarly, in *Esso Petroleum Canada v. Security Pacific Bank*, 710 F.Supp. 275 (D.Or.1989), the court stated:

> The issue is not whether the Bank had cause to reject the documents presented by Esso, but whether, once the Bank made its decision to reject those documents, it properly notified Esso of its decision by specifying the alleged discrepancies in accordance with Article 16(d).

*Id.* at 280. Based on the court's review on the relevant case law, it appears that a majority of courts addressing the issue have held that a bank waives its right to offer valid grounds for rejecting LOC documents if it fails to fulfill the notice requirement in Art. 16(d). *See e.g., Banque De L'Union v. Manufacturers Hanover*, 787 F.Supp. 1416 (S.D.Fla.1991); *Agri Export Co-op v. Universal Sav. Ass'n*, 767 F.Supp. 824 (S.D.Tex. 1991); *Integrated Measurement Sys. v. International Commercial Bank of China*, 757 F.Supp. 938 (N.D.Ill.1991); *Crist v. J. Henry Schroder Bank & Trust Co.*, 693 F.Supp. 1429 (S.D.N.Y.1988).

However, a few courts have narrowed the estoppel language in UCP Article 16(e) by requiring the beneficiary to show that it relied on the issuer's notice to its detriment, or could have cured any defects. In a case relied upon by defendant, *LeaseAmerica Corp. v. Norwest Bank Duluth, N.A.*, 940 F.2d 345 (8th Cir.1991), the Eighth Circuit concluded that the notice requirement in UCP Art. 16(d) "was included in the UCP to give a beneficiary a chance to cure a curable defect, not to require the issuing bank to honor an untimely presentment." *Id.* at 349–50. *See also Republic of Senegal v. Brown Brothers Harriman & Co.*, 1989 WL 63085 (S.D.N.Y. June 7, 1989).

Defendant also cites other cases supporting its opposition to a "strict preclusion" notice requirement, but these cases involved an earlier version of the UCP, which did not include an estoppel provision equivalent to Article 16(e). *See e.g., Occidental Fire & Casualty Co.*, 918 F.2d 1312 (7th Cir.1990); *Flagship Cruises Ltd. v. New England Merchants Nat'l Bank*, 569 F.2d 699 (1st Cir. 1978); *American Employers Insurance Co. v. Pioneer Bank and Trust Co.*, 538 F.Supp. 1354 (N.D.Ill.1981). Because these cases involved a materially different version of the UCP, this court will not consider them in deciding this matter. Plaintiff also notes that at least two courts have explicitly rejected this "detrimental reliance" or "usefulness of notice" requirement under the UCP 400. *See Kerr–McGee*, 872 F.2d at 974 and *Banque De L'Union*, 787 F.Supp. 1416 (S.D.Fla. 1991).

Hence, this court's review of the relevant case law reveals that the majority of courts addressing this issue have embraced a "strict preclusion" notice standard, and do not require a showing of detrimental reliance.

After reviewing the relevant case law, the court concludes that stronger authority and superior logic supports adoption of a "strict preclusion" notice standard under UCP Article 16(e), which provides that an issuing bank waives its right to offer valid grounds for rejecting LOC documents if it fails to fulfill the notice requirement in Article 16(d), and that an LOC beneficiary is not obligated to

show detrimental reliance or ability to cure before this strict notice standard will apply.

■ In support of this holding, the court notes that a "strict notice" requirement is consistent with Michigan's adoption of the majority "strict compliance" rule for presentment of LOC documents. Holding both parties to strict compliance standards will add certainty and efficiency to LOC law. In a case like this, opening up the question of plaintiff's ability to cure would raise numerous factual issues and require much speculation, thereby complicating the case tremendously. Moreover, these are sophisticated parties who are well aware of the strict compliance rules governing LOCs, and should have been aware of the numerous court decisions requiring LOC issuers to adhere to strict notice standards. Hence, the application of a strict notice rule in this case comports with fundamental principles of fairness.

For these reasons, this court adopts a strict notice rule, holding that under Article 16(e) of the UCP, Comerica is estopped from relying on any valid reasons for dishonoring Toyotsu's draws of which Toyotsu was not properly notified pursuant to UCP Article 16(d).

### E. *Sufficiency of Defendant's Notice*

■ Now the court must apply this strict notice standard to determine whether the notice provided by Comerica for its dishonor of Toyotsu's draws was timely and sufficient. Plaintiff has not objected to the timeliness of the original notices telexed Comerica. Hence, the first issue the court must decide is whether these original notices were sufficient.

UCP Article 16(d) requires that a bank rejecting a presentment must "specify the discrepancies" upon which its dishonor is based. The facts of this case raise two questions: (1) How specific must the notice be; and (2) Does the strict notice rule require an issuing bank to provide *all* possible grounds for rejection in its initial notice.

In *Occidental Fire & Casualty Co. v. Continental Bank,* 918 F.2d 1312, 1318 (7th Cir. 1990), the court held that a bank must give "unambiguous reasons for dishonor." However, at least one district court has held that

Article 16(d) does not "require an extensive and detailed itemization of each of the particular deficiencies of documents submitted to satisfy the requirements of the Letter of Credit." *Republic of Senegal v. Brown Bros. Harriman & Co.,* 1989 WL 63085 (S.D.N.Y. June 7, 1989).

In this case, the parties agree that the initial timely notice of dishonor telexed to plaintiff by defendant on April 11, 1994, referred specifically to batch no. BB620–22477 (identifying the March 23 shipment) and stated: "APPLICANT HAS REJECTED DOCUMENTS DUE TO LATE SHIPMENT." On April 14, 1994, Comerica sent plaintiff two notices, one referring specifically to batch nos. BB620–22769 and 22770 (identifying the March 25 and 26 shipments), and the other notice referring to batch no. BB150–51715 (identifying the March 29 shipment). Both April 14, 1994 notices stated: "DOCUMENTS REJECTED BY APPLICANT DUE TO LATE SHIPMENT."

In its cross-motion for summary judgment, defendant Comerica argues that these notices should be interpreted to mean what it now asserts as its reason for dishonor—that plaintiff presented air waybills dated after February 7, 1994. However, this is not the message communicated by the plain language of these notices. Instead, they state that the LOC "Applicant" (which is defined as Media Vision under the LOC) rejected plaintiff's documents due to late shipment.

■ This is not a valid reason for dishonoring the draws. First, only the issuing bank, in this case Comerica, is in a position to accept or reject presentment documents. Hence, the use of the term "Applicant," which refers to Media Vision under the LOC, was erroneous and misleading. However, even if it is assumed that the notices intended to communicate **Comerica's** reasons for rejecting the documents, the clear language used explains that the problem was *late shipment.* Pursuant to Amendment No. 2 to the LOC, the "Latest Date of Shipment" was March 31, 1994. Because the parties have stipulated that all shipments occurred prior to that date, this court concludes that "late

shipment" was an insufficient reason for rejection.

■ Under the strict notice standard adopted by this court, a LOC beneficiary should not bear the burden of speculating on the various possible interpretations of the language in a rejection notice. The plain language of the notice should clearly communicate the reasons for the withdrawals.

■ In this case, defendant contends that its dishonor was based on a documentary deficiency, an incorrect date on air waybills. In order for an issuing bank to give sufficient notice to a beneficiary about a documentary deficiency, this court concludes that its notice must make a specific reference to the document in question. An issuing bank should also identify, or in some way make reference to the non-conforming aspect of the document. If the issuing bank fails to fulfill these requirements, as it did in this case, its notice will be insufficient and it will be estopped from relying on the documentary deficiency as a reason for its dishonor. Applying this standard to this case, it is clear that defendant's initial notices did not sufficiently communicate to Toyotsu that the draws were rejected because air waybills dated after February 7, 1994 were presented.

However, this case is further complicated by the fact that the initial rejection notices were not the only communication between the parties concerning Comerica's refusal to honor Toyotsu's draws on the March, 1994 shipments. After receiving Comerica's April 14, 1994 notices, on April 15, 1994, plaintiff telexed Comerica explaining that it had, in fact, made all shipments before March 31, 1994, and asking Comerica to clarify the reasons for rejection. Plaintiff's telex referenced only the fourth shipment, sent on March 29, 1994, identified as batch no. BB 150–21715. On that same day, Comerica responded with a follow-up telex, also referencing the fourth shipment no. BB 150–21715. This clarification telex stated: "PLEASE REFER TO OUR AMENDMENT NO. 3 DD 21JAN94 WHICH STATES 'AIRWAY BILLS ... DATED NOT LATER THAN 07FEB94.' "

This clarification notice raises three additional issues to be resolved by the court: (1) whether the clarification notice should be considered by the court at all; (2) if so, whether it applies to all four draws, or only to the draw identified as no. BB 150–21715 specifically referenced in the telex; and (3) whether it sufficiently gives notice of the reason for rejection.

■ On the first issue, some courts have adopted the stringent position favored by plaintiff, holding that "any grounds for dishonor not stated in the original notice are waived." *Integrated Measurement Systems, Inc. v. International Commercial Bank of China,* 757 F.Supp. 938, 947 (N.D.Ill.1991) (citing *First Arlington National Bank v. Stathis,* 90 Ill.App.3d 802, 807, 46 Ill.Dec. 175, 180, 413 N.E.2d 1288, 1293 (1980)). Plaintiff also relies on the Eleventh Circuit case *Kerr–McGee Chemical Corp. v. FDIC,* 872 F.2d 971, 974 (11th Cir.1989), in which the court held that a bank's failure to assert a valid defect involving the first presentment precluded it from asserting the defect at the time of the second presentment. *See also Crist v. J. Henry Schroder Bank & Trust Co.,* 693 F.Supp. 1429, 1433 (S.D.N.Y.1988) (court held that failure to state valid reasons for dishonor in notice precluded bank from subsequently asserting reasons). However, these cases are distinguishable from the matter at hand in that they did not involve a situation where, as here, a subsequent notice was received just one day after the original notice was received.

■ Looking to the language of the UCP, which requires a bank to provide timely and sufficient notice, this court holds that the sufficiency of an issuing bank's notice should be evaluated based on **all** timely notices provided. Hence, Comerica's clarification notice should be considered by the court so long as it was timely.

■ The timeliness of a notice is not clearly defined in the 1983 version of the UCP, as it provides only that an issuing bank "shall have a reasonable time" in which to examine presentment documents and shall give notice "without delay." UCP 400 Art. 16(c) and (d). However, the current version

of the UCP resolved this ambiguity by providing that notice shall be given "without delay but no later than the close of the seventh banking day following the day of receipt of the documents." UCP 500, Art. 14(d)(i).

■ Applying this timeliness rule to this case, the court concludes that defendant's April 15, 1994 clarification notice was timely, as it referenced the draw identified as BB 150–21715, which was presented by plaintiff on April 12, 1991. Thus, the court will consider the telex in evaluating the sufficiency of defendant's notice. However, the clarification notice does not apply to all four March, 1994 draws. Under a strict notice standard, the court concludes that the clarification notice applies only to the draw specifically referenced in the telex, in this case draw BB 150–21715, identifying the March 29, 1994 shipment to Media Vision.

■ However, the limited effect of the clarification notice is of little significance, as the court concludes that it was still not enough to make defendant's notice of rejection on plaintiff's final draw sufficient. The clarification telex stated: "PLEASE REFER TO OUR AMENDMENT NO. 3 DD 21JAN94 WHICH STATES 'AIRWAY BILLS ... DATED NOT LATER THAN 07FEB94.'" First of all, this clarification notice cannot be viewed in isolation. Based on Toyotsu's April 15, 1991 telex to Comerica requesting clarification, it is clear that after Toyotsu received the original notice of rejection, it had no idea that the transport documents presented were the source of the problem. When Toyotsu received the clarification notice, it was finally referred to the section of the LOC governing presentment documents. However, this is not enough to fulfill the UCP's notice requirement, as the notice fails to identify the deficient document or explain the cause for its deficiency. As stated above, this court concludes that sufficient notice of a documentary deficiency under an LOC must include an express identification of the non-conforming document and make some reference to the cause of its deficiency.

■ Thus, the court concludes that the original notice and clarification telex together failed to provide sufficient notice to support defendant's rejection of plaintiff's draw on the March 29, 1994 shipment. As discussed above, the original notices from Comerica rejecting the draws on the first three March, 1994 shipments were insufficient as they failed entirely to communicate that dishonor was based on an alleged documentary deficiency.

For these reasons, this court concludes that defendant Comerica is estopped from relying on the fact that plaintiff presented air waybills dated later than February 7, 1994 to support its dishonor of plaintiff's draws on the March, 1994 shipments. Hence, because no genuine issues of material fact remain in dispute on this issue, plaintiff must prevail as a matter of law.

### III.

Based on this court's adoption and application of a strict preclusion notice rule to this LOC, **IT IS ORDERED** that plaintiff Toyotsu's motion for summary judgment be, and hereby is, **GRANTED,** and that defendant Comerica's cross-motion for summary judgment be, and hereby is, **DENIED.** Accordingly, defendant must pay plaintiff for all four draws on the disputed March, 1994 shipments, a total of **$1,995,756,** plus interest.

**IT IS FURTHER ORDERED** that upon payment of this sum from defendant, plaintiff will assign any recovery on its proof of claim in the Media Vision bankruptcy case to defendant.