REVISED DECEMBER 11, 2008
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

November 24, 2008

**Charles R. Fulbruge III**
Clerk

No. 07-30441

LABARGE PIPE & STEEL CO.

Plaintiff-Appellant

v.

FIRST BANK; ALLEN J. DAVID

Defendants-Appellees

Appeal from the United States District Court
for the Middle District of Louisiana

Before JONES, Chief Judge, GARWOOD, and JOLLY, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiff-appellant, LaBarge Pipe & Steel Co. (LaBarge), appeals the district court's grant of summary judgment for defendants-appellees, First Bank and Allen David. LaBarge sued defendants asserting claims relating to the Irrevocable Standby Letter of Credit No. 180 that First Bank issued to LaBarge, including claims for wrongful dishonor, breach of a letter of credit, detrimental reliance, breach of a good faith obligation, and negligent misrepresentation.[1] For

---

[1] According to its second amended complaint, LaBarge asserts all of these claims against First Bank, and only the negligent misrepresentation claim against David.

the reasons stated below, we affirm in part and reverse and remand in part to the district court.

## FACTS AND PROCEEDINGS BELOW

LaBarge, a Missouri company, sells industrial pipe across the United States. PVF USA, LLC (PVF), a Louisiana company, sold industrial pipe, valves, and fittings from its office in Port Allen, Louisiana.[2] On November 19, 2002, PVF requested and received a quote for the purchase of steel pipe from LaBarge. On November 25, 2002, PVF ordered 3,800 feet of thirty-inch pipe from LaBarge for a total price of $143,613.40 Matthew Mannhard, a LaBarge salesman, reviewed PVF's credit history, and informed PVF that LaBarge would not sell the requested pipe on open credit terms. Therefore, he gave PVF the following payment options: sending a cashiers check via overnight mail, wire transferring the funds, or obtaining a letter of credit. PVF chose to obtain a letter of credit.

PVF then contacted First Bank, a commercial bank in Baton Rouge, Louisiana, to arrange for First Bank to issue the letter of credit. Acting as LaBarge's representative in the arrangement, Mannhard worked with Allen David, a First Bank employee, to arrange for First Bank to issue a standby letter of credit in the amount of $144,000.00 for the benefit of LaBarge. David and Mannhard discussed and finalized the letter of credit. On November 25, 2002, David faxed a copy of the letter of credit to LaBarge. The facsimile cover sheet stated: "Here is the letter of credit you requested. Please let me know if you need any additional information." After reviewing the facsimile copy of the letter of credit, Mannhard requested a change in the language of the letter of credit, which First Bank made. On November 26, 2002, David faxed a copy of the thus amended letter of credit to LaBarge. The facsimile cover sheet, which

---

[2] PVF filed bankruptcy on January 9, 2003. The parties do not discuss, and the record does not reveal, the current status of the company or of the bankruptcy proceedings. LaBarge indicates in its brief that PVF no longer operates its business at the Port Allen, Louisiana location.

contained David's signature, stated: "Here is the revision to the letter of credit you requested. Please let me know if you need any additional information."

The letter of credit issued by First Bank is dated November 25, 2002. It reflects that "LaBarge Pipe & Steel, Co." is "BENEFICIARY" and that "PVF USA, L.L.C." is "APPLICANT." It is addressed to LaBarge and states "We hereby establish our Irrevocable Standby Letter of Credit No. 180 in your favor for the account of PVF USA available by your drafts on us payable at sight for any sum of money not to exceed a total of $144,000 . . . when accompanied by this Irrevocable Letter of Credit" and by LaBarge's statement certifying that invoices to PVF "remain unpaid 30 days or more after invoice date" and by copies of the invoices. It also states that: "the original Irrevocable Letter of Credit must be presented with any drawing so that drawings can be endorsed on the reverse thereof." Furthermore, it states that "Except so far as otherwise expressly stated, this irrevocable Letter of Credit is subject to the 'Uniform Customs and Practice for Documentary Credits (1983 Revision) International Chamber of Commerce Brochure No. 400'" (the UCP 400). Finally, the letter of credit states that it "shall be valid until February 23, 2003." It bears the handwritten signatures of David and a First Bank Vice President.

LaBarge claims that in a phone conversation on November 26, 2002, Mannhard asked David at what point LaBarge would be protected by the letter of credit so that it could safely ship the pipe to PVF. At this point, Mannhard allegedly informed David that LaBarge did not want to ship the pipe to PVF until the purchase price was fully secured by the letter of credit. According to LaBarge, David told Mannhard that the letter of credit was issued, that First Bank was obligated to pay if PVF defaulted on its obligations, and that LaBarge could now safely ship the pipe. In their brief, First Bank and David do not

explicitly affirm or deny that David made these representations to Mannhard.[3] However, in his deposition, David testified that he did not recall speaking with Mannhard on November 25 or 26, 2002 regarding whether LaBarge was secure under the letter of credit at that time.

After these alleged conversations occurred, LaBarge shipped pipe invoiced at $95,216.60 to PVF on November 26, 2002. It sent an additional shipment of pipe (invoiced at $48,396.80) to PVF on December 4, 2002. The total amount of pipe shipped was invoiced at $143,613.40. PVF did not make any payment for any of the pipe, and filed bankruptcy on January 9, 2003.

David never told Mannhard or any other LaBarge representative what he planned to do with the original signed version of the letter of credit. It is unclear what happened to the original November 25, 2002 letter of the credit as LaBarge, First Bank, and PVF have not been able to locate it. In David's deposition, he testified that he kept the letter of credit after faxing a copy of it to LaBarge on November 26, 2002, and called PVF officials multiple times to encourage them to collect the letter of credit from his office. He testified that on December 2, 2002, PVF official, Scott Kirby, took the letter of credit when he came to First Bank to make a deposit. However, in his deposition, Kirby denies ever having received the original letter of credit. Furthermore, in its original complaint, LaBarge asserted that on December 10, 2002, First Bank informed LaBarge that it had given the original of the letter of credit to PVF. Then, from January 15 to 20, 2003, LaBarge attempted to locate the original letter of credit from PVF and First Bank without success.

In the latter part of January and early February of 2003, LaBarge and First Bank representatives twice talked on the telephone to discuss the documentation that LaBarge needed to present in order to draw on the letter of

---

[3] However, at oral argument, counsel for First Bank argued that whether David made these representations to Mannhard was a disputed issue of fact.

credit. During these two telephone conversations, LaBarge employees informed First Bank's executive vice president, Andrew Adler, that they could not locate the original letter of credit and only had the facsimile copy that they received from First Bank on November 26, 2002. Adler informed LaBarge representatives that First Bank would not honor a presentation without the original credit. After these conversations, Harold Burroughs, counsel for LaBarge, called for Adler to discuss payment under the letter of credit. James Lackie, First Bank's counsel, returned the call on February 6, 2003. In that phone call, Burroughs informed Lackie that LaBarge could not locate the original letter of credit. Burroughs again so informed Lackie in a letter dated February 11, 2003.

In February 2003, LaBarge attempted to draw on the letter of credit in the amount of $143,613.40, the total price of all pipe it had shipped to PVF. It mailed the letter of credit facsimile it had received on November 26, 2002, along with the relevant unpaid invoice copies and its certificate that they remained unpaid for thirty days or more after their dates, to First Bank on February 14, 2003. First Bank received these documents on the morning of Monday, February 17, 2003. Also included with LaBarge's February 14, letter was an Affidavit of Beneficiary of Irrevocable Letter of Credit and Indemnification of Issuer signed by Michael Brand, CFO, Secretary, and Treasurer of LaBarge, which stated that the "original letter of credit" could not be produced because it was not delivered to LaBarge and was lost or destroyed. This document also essentially provided that LaBarge would reimburse First Bank if someone were to present the original letter of credit and were able to successfully draw on that document. First Bank, on the day it received LaBarge's presentation, Monday, February 17, 2003, mailed to LaBarge a letter dishonoring its draw. LaBarge received this letter on Friday, February 21, 2003. The letter, which was written by First Bank's attorney, did not advise that First Bank was holding LaBarge's

documents at its disposal, or that First Bank would return the documents to LaBarge. While LaBarge was waiting for a response from First Bank, Brand called First Bank officials two times on Wednesday, February 19, 2003. Brand received no response to his inquiries concerning the draw on the letter of credit until Adler returned Brand's call during the afternoon of Thursday, February 20, 2003, and informed Brand that First Bank would not honor the letter of credit because LaBarge did not include the original letter of credit in its presentation.

On April 11, 2003, LaBarge filed suit against First Bank, asserting claims for wrongful dishonor, breach of the letter of credit, detrimental reliance, and breach of a good faith obligation. LaBarge filed a Motion for Leave to Amend Complaint on November 21, 2003, adding David as a defendant, and adding a claim of negligent misrepresentation against First Bank and David. The district court accepted this motion in an order dated January 5, 2004, and David was added as a party to the case.[4] LaBarge also filed a separate suit against First Bank and David on November 24, 2003. These two suits were consolidated. On May 4, 2004, First Bank and David filed a motion for summary judgment against LaBarge. On June 25, 2004, LaBarge filed a motion for partial summary judgment against the defendants. The district court granted the defendants' motion for summary judgment and denied LaBarge's motion for partial summary judgment, and issued a Ruling on Motion for Summary Judgment and Motion for Partial Summary Judgment on April 17, 2007. It also granted First Bank's Motion for Award of Attorney's Fees and entered its final judgment on that date. LaBarge filed a timely notice of appeal on May 8, 2007.

---

[4] In its Second Amended Complaint, LaBarge also added claims against PVF officials, Charles D. Sylvest, Bruce Wayne Thompson, and Michael Scott Kirby. However, these claims have been dismissed from the case, and are not at issue in this appeal.

## DISCUSSION

We limit our discussion to the issues raised by the parties on appeal: whether LaBarge presented the "original" letter of credit with its request to draw; whether UCP 400, Article 16(e) precludes First Bank from asserting that the documents LaBarge presented are not in accordance with the terms and conditions of the letter of credit; and whether the district court erred in granting summary judgment for First Bank and David on LaBarge's detrimental reliance and negligent misrepresentation claims.[5]  For the reasons stated below, we reverse the district court's judgment denying LaBarge's recovery from First Bank on the letter of credit and we affirm the district court's judgment that First Bank and David were entitled to summary judgment on LaBarge's detrimental reliance and negligent misrepresentation claims, and we remand for entry of appropriate judgment.

The district court's jurisdiction was based on diversity of citizenship under 28 U.S.C. § 1332(a)(1).  The governing substantive law is that of Louisiana.

This court applies a de novo standard of review when determining whether a district court erred in granting summary judgment. Scottsdale Ins. Co. v. Knox Park Construction, Inc., 488 F.3d 680, 683 (5th Cir. 2007).  Under Federal Rule of Civil Procedure 56(c), summary judgment is proper when the evidence shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

---

[5] LaBarge also argues that the declaration of First Bank's expert witness, Professor Ronald J. Mann, should be disregarded.  LaBarge moved to strike the declaration in the trial court on the basis that Professor Mann lacked qualifications because his methodology did not comport with Daubert requirements.  See Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S. Ct. 2786 (1993).  However, LaBarge did not raise this argument in its original brief before this court.  Because arguments not asserted in an original brief are generally deemed to be abandoned, we will not address this argument. Haspel & Davis Milling & Planting Co. Ltd. v. Board of Levee Comm'rs of the Orleans Levee Dist., 493 F.3d 570, 579 n.29 (5th Cir. 2007).

A.    Letters of Credit

Letters of credit, or "credits," are commercial devices generally used to relieve the tension between merchants and buyers when the merchant is hesitant to lose possession of its goods before being paid, but the buyer would like to have the goods before parting with its money. JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE, § 26-1 (5th ed. 2008) [hereinafter WHITE & SUMMERS]. Letters of credit come in two forms, "commercial" and "standby." Id. The credit at issue in this case is a standby letter of credit.

In a typical standby letter of credit arrangement, a financial institution, the "issuer," serves as something like a guarantor of an amount of money in a transaction between a buyer, the "customer" or "applicant," and a seller, the "beneficiary" of the letter of credit. Id. at § 26-2; see also F.D.I.C. v. Plato, 981 F.2d 852, 854 n.3 (5th Cir. 1993). If the applicant breaches the underlying agreement with the beneficiary, the beneficiary seeks payment from the issuer by presenting to the issuer a request for payment and certain documents specified in the letter of credit, such as documents of title, transport, insurance, and commercial invoices. Plato, 981 F.2d at 854 n.3; Alaska Textile Co. v. Chase Manhattan Bank, 982 F.2d 813, 815 (2d Cir. 1992). There is generally a reimbursement contract (also called an "application agreement") between the issuer and the applicant that requires the applicant to reimburse the issuer for payments made under the letter of credit. Alaska Textile, 982 F.2d at 815; WHITE & SUMMERS § 26-2.

A standby letter of credit is similar to a guaranty in that it acts as a protection against default by a customer in a purchase agreement. WHITE & SUMMERS § 26-1(b). However, a guaranty differs from a standby letter of credit in that under a standby letter of credit, the beneficiary has bargained for the right to be paid upon presentation of specific documents, even if the beneficiary defaults on the underlying contract with the applicant. Id. at § 26-2(a); see also

David J. Barru, How to Guarantee Contractor Performance on International Construction Projects: Comparing Surety Bonds with Bank Guarantees and Standby Letters of Credit, 37 GEO. WASH. INT'L L. REV. 51, 66-67 (2005). The issuer of a letter of credit may not raise the defenses that the applicant may assert against payment to the beneficiary. WHITE & SUMMERS § 26-2(a); Barru, supra, at 67. The issuer's liability generally turns solely on whether the beneficiary presents the documents specified in the credit. Id.

The obligation of the issuer to pay the beneficiary is independent of any obligation of the applicant to the issuer. WHITE & SUMMERS § 26-2. Thus, if the applicant enters bankruptcy after the letter has been issued, but before it has been drawn upon, despite the fact that the applicant may not be able to pay the issuer, the issuer must pay the beneficiary on a properly presented draw on the letter of credit. Id.

In this case, LaBarge and PVF had an underlying contract for the sale of pipe. First Bank acted as the "issuer" of the letter of credit, while LaBarge was the "beneficiary," and PVF was the "applicant." The letter of credit is an "undertaking" (as opposed to a contract) between the First Bank and LaBarge in which First Bank promised to pay LaBarge if PVF did not pay before thirty days after the date of LaBarge's invoices for the sale of pipe and if LaBarge presented to First Bank specified documents in its timely request to draw on the credit. Id.

B. UCP 400 and the UCC

The letter of credit in this case is governed by both Article Five of the Uniform Commercial Code as adopted by Louisiana (the UCC or Article Five) and the UCP 400. See LA. REV. STAT. ANN. §§ 10:5-101 - 10:5-118 (2003). The Uniform Customs and Practice (UCP) is a compilation of the usage of the trade for letters of credit. Banca del Sempione v. Provident Bank of Maryland, 75 F.3d 951, 954 (4th Cir. 1996). Many revisions of the UCP have been issued since the

International Chamber of Commerce issued the first version in 1930. Alaska Textile, 982 F.2d at 816. The latest version of the UCP is the UCP 600, which became effective on July 1, 2007. WHITE & SUMMERS § 26-3(b) n.6. The letter of credit at issue in this case explicitly incorporates the rules of the UCP 400, the 1983 version of the UCP. See LA. REV. STAT. ANN. § 10:5-116(c) ("Except as otherwise provided in this Subsection, the liability of an issuer . . . is governed by any rules of custom or practice, such as the Uniform Customs and Practice for Documentary Credits, to which the letter of credit . . . is expressly made subject."). Thus, in deciding this case, this court must follow the terms of the UCP 400.

However, Article 5 indicates that "letters of credit that incorporate the UCP or similar practice will still be subject to Article 5 in certain respects." Id. at § 10:5-116(c) cmt. 3. Thus, the incorporation of UCP 400 into the letter of credit does not render Article 5 completely inapplicable in this case. Id. Instead, "where there is no conflict between Article 5 and the relevant provision of the UCP . . . both apply." Id.; WHITE & SUMMERS § 26-3 (c). However, the UCP 400 governs where there is a conflict between its provisions and those of Article 5. LA. REV. STAT. ANN. § 10:5-116(c).[6]

---

[6] The pertinent language LA. REV. STAT. ANN. § 10:5-116(c) is as follows:
"If (i) this Chapter would govern the liability of an issuer . . . under Subsection (a) or (b); (ii) the relevant undertaking incorporates rules of custom or practice; and (iii) there is conflict between this Chapter and those rules as applied to that undertaking, those rules govern except to the extent of any conflict with the nonvariable provisions specified in [section] 10:5-103(c)."
The "nonvariable provisions" referenced in section 10:5-116(c) are listed in section 10:5-103(c) as follows:
"With the exception of this Subsection, Subsections (a) and (d), [sections] 10:5-102(a)(9) and (10), 5-106(d), and 5-114(d), and except to the extent prohibited in [sections] 10:1-102(3) and 5-117(d), the effect of this Chapter may be varied by agreement or by a provision stated or incorporated by reference in an undertaking."
None of these nonvariable provisions are pertinent to the legal issues in this case. Thus, when there is a conflict between the provisions of the UCC and the UCP 400 that are pertinent to this case, the provisions of the UCP 400 apply.

C.    The "Original" Letter of Credit

The letter of credit at issue in this case states that "The original Irrevocable Letter of Credit must be presented with any drawing so that drawings can be endorsed on the reverse thereof." First Bank refused to honor LaBarge's request to draw on the letter of credit because it presented the facsimile version of the credit that it received from First Bank on November 26, 2002 instead of the original credit. The district court held that "it is undisputed that LaBarge did not submit the original letter of credit to First Bank when LaBarge attempted to draw on the letter of credit." However, LaBarge contends that the facsimile letter of credit that it presented to First Bank qualifies as the original letter of credit. We disagree.

The UCP 400 and Louisiana law provide guidance as to what form of a letter of credit a beneficiary can present to an issuer. Note three of the UCC comments to LA. REV. STAT. ANN. § 10:5-104 indicates that letters of credit may be issued electronically instead of as hard copies (at least when marked by the relevant bank as "original"). This suggests that a letter of credit transmitted to a beneficiary via fax machine could be successfully presented to an issuer. Furthermore, UCP 400, Article 12 states:

> "a.  When an issuing bank instructs a bank (advising bank) by any teletransmission to advise a credit . . . and intends the mail confirmation to be the operative credit instrument . . . the teletransmission must state 'full details to follow' (or words of similar effect), or that the mail confirmation will be the operative credit instrument . . . . The issuing bank must forward the operative credit instrument . . . to such advising bank without delay.
> b.  The teletransmission will be deemed to be the operative credit instrument . . . and no mail confirmation should be sent, unless the teletransmission states 'full details to follow' (or words of similar effect), or states that the mail confirmation is to be the operative credit instrument . . . ."[7]

---

[7] An "adviser" is "a person who, at the request of the issuer, a confirmor, or another adviser, notifies, or requests another adviser to notify, the beneficiary that a letter of credit has

This language suggests that the facsimile sent to LaBarge by First Bank might be considered the "operative credit instrument" because it does not state "full details to follow" or similar language, and does not state that a mail confirmation will be the operative letter of credit.[8]

Nonetheless, these provisions do not apply in this case because the letter of credit specifically provides that LaBarge must present the "original" to successfully draw. The term "original" is not defined in the credit, Article Five, or the UCP 400. Article 12 of UCP 400 discusses what should be considered the "operative credit instrument," but does not use the term "original." However, the

---

been issued, confirmed, or amended." LA. REV. STAT. ANN. § 10:5-102(a)(1). Thus an "advising bank" acts as a middle man between the issuer and the beneficiary of a letter of credit. It "undertakes to the issuer and to the beneficiary accurately to advise the terms of the letter of credit, confirmation, amendment, or advice received by that person and undertakes to the beneficiary to check the apparent authenticity of the request to advise." Id. at § 10:5-107(c). No advising bank or adviser was utilized in the letter of credit transaction at issue in this case. Instead, LaBarge dealt directly with the issuing bank.

[8] First Bank argues that Article 22 of the UCP 400 describes what should be considered the "original" letter of credit. This Article states that:
> "a. All instructions for the issuance of credits and the credits themselves . . . must state precisely the document(s) against which payment, acceptance or negotiation is to be made. . . .
> c. Unless otherwise stipulated in the credit, banks will accept as originals documents produced or appearing to have been produced:
> i   by reprographic systems
> ii  by, or as the result of, automated or computerized systems
> iii as carbon copies,
> If marked as originals, always provided that, where necessary, such documents appear to have been authenticated."

This language addresses what "documents" should be considered originals. This Article only appears to apply to the authenticity of supporting documents, not to letters of credit themselves because it indicates that the instructions regarding the documents it describes should be contained in the letter of credit. Furthermore, as Article 12 specifically addresses what should be considered an "operative credit instrument," and contains different requirements than those found in Article 22 for original "documents," the two articles would conflict if they both applied to the letters of credit themselves. Moreover, the facsimile in question is not "marked as [an] original[]." However, because the letter of credit at issue in this case specifically requires the "original" credit to be presented for a successful draw, and we hold that the language of the credit, not any provisions of UCP 400, govern this issue, we need not now address this issue.

plain meaning of the term is clear. In its definition of "original," a leading legal dictionary states that "[a]s applied to documents, the original is the first copy or archetype; that from which another instrument is transcribed, copied, or imitated." BLACK'S LAW DICTIONARY 1099 (6th ed. 1990). Thus, it is clear that the term "original" in the instant letter of credit referred to the actual first copy of the document. Though a facsimile copy may in certain circumstances qualify as an "operative credit instrument" under UCP 400, Article 12, it is not necessarily the "original" letter of credit. Because the letter of credit expressly required LaBarge to present the "original" of the credit, LaBarge could not present anything other than the document from which the facsimile copy was made in order to successfully draw.[9] See Brul v. MidAmerican Bank & Trust Co., 820 F. Supp. 1311, 1314 (D. Kan. 1993) (holding that when the letter of credit required the "original" credit to be presented, the beneficiaries could not force the issuing bank to honor a draw when they presented a photocopy of the credit); Airlines Reporting Corp. v. Norwest Bank, 529 N.W.2d 449, 450, 452-53 (Minn. Ct. App. 1995) (holding that when the beneficiary had received but lost the original credit, and the credit stated that when "the draft is presented, it must be accompanied by the Letter of Credit," presentation of an altered copy of the letter of credit did not constitute strict compliance with the terms of the credit).

Furthermore, First Bank's actions do not alter the plain meaning of the term "original" in the letter of credit. LaBarge suggests that the words that First Bank wrote on the cover sheets to the facsimile copies of the credit that it sent to LaBarge on November 25 and 26, 2002 indicate that the facsimile copy is the original letter of credit. On the facsimile cover sheet sent November 25,

---

[9] Moreover, the credit facially contemplates possible multiple draws and its express requirement that draws be endorsed on "the original Irrevocable Letter of Credit" obviously contemplates that there is only one original, and that must be the one and only document actually signed by the two bank officers.

2002, David wrote "Here is the letter of credit you requested." On the cover sheet sent with the facsimile on November 26, 2002, he wrote, "Here is the revision to the letter of credit you requested." LaBarge suggests that by referring on November 25 to the facsimile version as "the" letter of credit, and by making an arguably somewhat similar reference on November 26, First Bank indicated that the facsimiles were the original copies of the credit. This argument is without merit. The language on the cover sheets merely indicates that the facsimile is a copy of the original credit. It does not alter the plain meaning of the term "original" as it is used in the text of the credit.

Moreover, LaBarge suggests that the facsimile copy of the credit is the original because First Bank represented to LaBarge that LaBarge had everything necessary to secure payment under the credit when it only had the facsimile copy. However, these alleged representations only demonstrate that First Bank gave faulty information, not that the facsimile copy should be considered the original.[10]

The language of the letter of credit is clear. Therefore, we hold that the district court properly concluded that LaBarge did not present the "original" letter of credit to First Bank when it presented the November 26, 2003 facsimile copy of the credit to First Bank in its attempt to draw in February of 2003 and that LaBarge's only attempted draw on the letter of credit was hence invalid.

D.    UCP 400, Article 16(e) Preclusion

LaBarge argues that First Bank should have to honor the letter of credit because it did not comply with the terms of the UCP 400 when dishonoring LaBarge's request to draw. Under UCP 400, Article 16(c) and (d), an issuing bank must take specific steps when dishonoring a request to draw on a letter of

---

[10] Moreover, the statements and conduct of LaBarge in the last half of December 2002, January 2003 and the first week of February 2003, reflect that, at least by then, it well understood that the November 26, 2003 facsimile was not what the letter of credit referred to as "the original Irrevocable Letter of Credit" that "must be presented with any drawing."

credit.[11]   First, the issuing bank has a "reasonable time" to examine the documents and decide whether to pay or dishonor the request to draw.  UCP 400, Article 16(c).  Next, if the bank decides to dishonor, it then "must give notice to that effect without delay by telecommunication or, if that is not possible, by other expeditious means . . . to the beneficiary," and must state the discrepancies on which it bases its decision to dishonor.  UCP 400, Article 16(d).  Finally, it must state whether it will hold the documents or return them to the beneficiary.  Id.  If a bank does not comply with these steps when dishonoring a request to draw, it "shall be precluded from claiming that the documents are not in accordance with the terms and conditions of the credit."  UCP 400, Article 16(e).  LaBarge contends, and this court agrees, that First Bank did not comply with Article 16(d) when dishonoring LaBarge's request to draw because once First Bank decided not to honor the draw it did not then provide notice of dishonor "without delay," and it did not "without delay" state the discrepancies in respect

---

[11] In relevant part, UCP 400, Article 16 states:

"c.  The issuing bank shall have a reasonable time in which to examine the documents and to determine as above whether to take up or to refuse the documents.

d.  If the issuing bank decides to refuse the documents, it must give notice to that effect without delay by telecommunication or, if that is not possible, by other expeditious means, to the bank from which it received the documents (the remitting bank), or to the beneficiary, if it received the documents directly from him.  Such notice must state the discrepancies in respect of which the issuing bank refuses the documents and must also state whether it is holding the documents at the disposal of, or is returning them to the presentor (remitting bank or the beneficiary, as the case may be).  The issuing bank shall then be entitled to claim from the remitting bank of any reimbursement which may have been made to that bank.

e.  If the issuing bank fails to act in accordance with the provisions of paragraphs (c) and (d) of this article and/or fails to hold the documents at the disposal of, or to return them to, the presentor, the issuing bank shall be precluded from claiming that the documents are not in accordance with the terms and conditions of the credit."

of which it refused to honor or inform LaBarge of the disposition of the documents it presented.

The district court held that LaBarge did not strictly comply with the terms of the credit because it did not present the "original" letter of credit in its request to draw. Therefore, it concluded that First Bank properly refused to honor LaBarge's request to draw. The district court also held that First Bank was not precluded by UCP 400, Article 16(e) from asserting that the documents that LaBarge presented were not in accordance with the terms and conditions of the credit. LaBarge knew that the letter of credit required presentation of the original letter of credit, but still submitted a facsimile copy with its request. Thus, the court held that under Fifth Circuit precedent, Philadelphia Gear Corp. v. Central Bank, 717 F.2d 230, 238 (5th Cir. 1983), LaBarge could not fairly argue that it was not timely and sufficiently notified of the discrepancy in presentation. The district court also found that First Bank did notify LaBarge of its intention to dishonor the request to draw "without delay by telecommunication." UCP 400, Article 16(d).

1. Strict Compliance

Under the doctrine of strict compliance, which applies to this transaction under Louisiana law, the documentation that the beneficiary of a letter of credit presents to the issuer in order to draw on a credit must comply exactly with the requirements of the credit or the issuer is entitled to refuse payment. LA. REV. STAT. ANN § 10:5-108(a);[12] Office of Conservation of the State of Louisiana v. Progressive Nat'l Bank of Rayne, 573 So.2d 1324, 1327 (La. Ct. App. 1991)

---

[12] LA. REV. STAT. ANN § 10:5-108(a) states:
"Except as otherwise provided in [section] 10:5-109, an issuer shall honor a presentation that, as determined by the standard practice referred to in Subsection (e), appears on its face strictly to comply with the terms and conditions of the letter of credit. Except as otherwise provided in [section] 10:5-113 and unless otherwise agreed with the applicant, an issuer shall dishonor a presentation that does not appear so to comply."

(indicating that strict compliance with the terms of a letter of credit is the law in Louisiana); Schweibish v. Pontchartrain State Bank, 389 So.2d 731, 737 (La. App. 1980) (indicating that under Louisiana law, an issuing bank was "entitled to demand strict compliance with the conditions stated in the letters of credit issued to [the] plaintiff"). Thus, an issuer properly dishonors a request to draw if the documents presented do not strictly comply with the credit's requirements and it timely and sufficiently notifies the beneficiary of its intent to dishonor. Philadelphia Gear, 717 F.2d at 236.

The facts regarding the documents presented to First Bank by LaBarge are not disputed. In its request to draw, LaBarge presented the facsimile copy of the letter of credit that it received from First Bank on November 26, 2002. However, the letter of credit required that "the original Irrevocable Letter of Credit must be presented with any drawing so that drawings can be endorsed on the reverse thereof." Because the facsimile version of the letter of credit was not "the original," LaBarge did not strictly comply with the terms of the letter of credit in making its request to draw. If First Bank had timely and properly dishonored LaBarge's presentation, it would have properly denied LaBarge's request because LaBarge did not strictly comply with the terms of the letter of credit. However, this case is complicated by the fact that First Bank did not follow the proper procedures when dishonoring LaBarge's request to draw on the letter of credit.

2. Timeliness and Sufficiency of Notice of Dishonor

First Bank failed to comply with the requirements of UCP 400, Article 16(d), when dishonoring LaBarge's presentation under the letter of credit. First, First Bank failed to give notice of its decision (and of the document discrepancies in respect to which it refused) "without delay by telecommunication," and second, when it did notify LaBarge that it would dishonor the presentation, it failed to state whether it was going to hold LaBarge's documents or return them to

17

LaBarge. Article 16(e) of UCP 400 provides that when the issuing bank does not follow one of these required steps when dishonoring a draw, it "shall be precluded from claiming that the documents are not in accordance with the terms and conditions of the credit."

### a. Timeliness of Notice

LaBarge contends that First Bank did not give timely notice under UCP 400, Article 16(d), which requires that "[i]f the issuing bank decides to refuse the documents [in a presentation], it must give notice [to the beneficiary] to that effect without delay by telecommunication or, if that is not possible, by other expeditious means . . ." and that notice also "must state the discrepancies in respect of which the issuing bank refuses the documents and must also state whether it is holding the documents at the disposal of, or is returning them to the presentor." LaBarge contends that First Bank did not give notice by telecommunication and did not give notice "without delay."

The district court held that First Bank timely notified LaBarge that it would not honor the presentation. It noted that the UCP 400 did not define "without delay," but that Article 5 provides that "[a]n issuer has a reasonable time after presentation, of at least three days, but not beyond the end of the seventh business day of the issuer after the day of its receipt of documents . . . to honor . . . [or] to give notice to the presenter of discrepancies in the presentation." LA. REV. STAT. ANN. § 10:5-108(b). Thus, the court concluded that First Bank complied with the requirements of Louisiana law by giving notice by telecommunication three days after the presentation. It held that the letter, which LaBarge received on February 21, 2003 (four days after First Bank received and decided to deny LaBarge's requested draw), and the phone call from Adler on February 20, 2003 (three days after First Bank received and decided to deny the request) were timely notice of dishonor. We disagree.

The district court erred in concluding that LA. REV. STAT. ANN. § 10:5-108(b) provided the relevant time for giving notice in this case.[13] UCP 400 does not define or explain the meaning of "without delay." However, the lack of an explicit definition of the time period that constitutes notice "without delay" does not indicate that section 10:5-108(b) applies in place of or in addition to UCP 400, Article 16(d). The terms of UCP 400 (requiring notice "without delay" after "issuing bank decides to refuse the documents") are clear and unambiguous, and they conflict with the terms of section 10:5-108(b) to the extent that the latter provides that notice of dishonor and of discrepancies in the presentation is always timely if given within three business days of presentment. Thus, this court should apply only the terms of the UCP 400 to this case. See LA. REV. STAT. ANN. § 10:5-116(c) (indicating that in most cases when a letter of credit incorporates the UCP, and the terms of the UCP conflict with the terms of the UCC, the terms of the UCP govern);[14] see also Alaska Textile, 982 F.2d at 821-23 (holding that when determining what constitutes a "reasonable time" under UCP 400, Article 16(c) (time for issuer to make decision whether to honor), it was improper to apply the UCC's three day time limit for what constitutes a "reasonable time").

As the Southern District of New York has noted when interpreting the meaning of the term "without delay" as it is used in UCP 400, Article 16(d):

---

[13] Section 10:5-108(b) provides:

> "(b) An issuer has a reasonable time after presentation, of at least three days, but not beyond the end of the seventh business day of the issuer after the day of its receipt of documents:
> (1) to honor,
> (2) if the letter of credit provides for honor to be completed more than seven business days after presentation, to accept a draft or incur a deferred obligation, or
> (3) to give notice to the presenter of discrepancies in the presentation."

[14] Respecting § 10:5-116(c), see supra, note 6.

19

"UCP 400 does not specifically define the term[] . . . 'without delay.' However, 'the phrase ['without delay'] is akin to 'immediate (at once), instant, instantaneous, instantly, prompt.' All of these synonyms connote a sense of urgent action within the shortest interval of time possible." Kuntal, S.A. v. Bank of New York, 703 F. Supp. 312, 313-14 (S.D.N.Y. 1989) (quoting Bank of Cochin Ltd. v. Manufacturers Hanover Trust Co., 808 F.2d 209, 213 (2d Cir. 1986), a case discussing a similar notification "without delay" requirement under the 1974 version of the UCP).

Furthermore, the term is defined as "[i]nstantly; at once," or "[w]ithin the time reasonably allowed by law." BLACK'S LAW DICTIONARY 1632 (8th ed. 2004). As UCP 400, Article 16(d) does not otherwise define "without delay" under this provision, that phrase must at least mean in the shortest time period reasonably possible. Thus, Article 16(d)'s requirement that an issuer give notice "without delay" commands that it give notice as quickly as reasonably possible after it has decided to dishonor a draw. Because the language of the UCP 400, Article 16(d) is clear, although other sources of law or other articulations of customary practices may provide specific time periods during which an issuer 's notice of dishonor will always be timely, such sources are not controlling in this case. As the UCP 400 does not provide a specific time during which an issuer's notice of dishonor will always be timely, none should be inferred into its provisions.

What constitutes "without delay" depends on the facts of each case. One court has even held that failure to notify on the day that the decision to dishonor was made was not notification "without delay." Datapoint Corp. v. M&I Bank of Hilldale, 665 F. Supp. 722, 727 (W.D. Wis. 1987). The Datapoint court held that the issuer did not notify the beneficiary of dishonor "without delay" under UCP 400 when it mailed notice of dishonor on the day it received the request instead of notifying the beneficiary by telephone, despite the fact that it told the beneficiary of the dishonor via telephone the next day when the beneficiary called the issuer.

Under the common meaning of the term, First Bank clearly did not notify LaBarge "without delay by telecommunication" (or otherwise) that it would not honor the presentation (or of any discrepancy in the documents presented). After First Bank received LaBarge's presentation on Monday, February 17, 2003, it waited until February 20, 2003 to call LaBarge to inform the company that it would not honor the draw. However, First Bank determined not to honor LaBarge's request to draw on February 17, 2003, the day it received the presentation, and First Bank wrote a letter to LaBarge on that date informing LaBarge of its decision. Nonetheless, First Bank waited over three days, from the morning of Thursday, February 17, 2003 until the afternoon of February 20, 2003, to inform LaBarge by telephone that it would not honor the presentation. Furthermore, when First Bank did call LaBarge, it was only in response to LaBarge's two February 19 phone calls. The letter dated February 17, 2003 (which is not notice "by telecommunication") arrived at LaBarge on February 21, 2003, four days after First Bank had received the presentation. These communications cannot be considered notice "without delay" as they were by no means within the shortest reasonably possible interval. First Bank could have easily replied to LaBarge virtually immediately, or at least in fewer than three days, by simply picking up the telephone and calling the company or faxing the February 17 letter to it. It did not even attempt to do so. Therefore, we hold that as a matter of law, under UCP 400, Article 16(d), First Bank did not notify LaBarge "without delay" that it would not honor its presentation.

        b.      Disposition of Documents

LaBarge also argues that First Bank must pay on the letter of credit because it failed to address the disposition of LaBarge's documents in any of the notices of dishonor that it did give, in violation of UCP 400, Article 16(d). Article 16(d) provides that when notifying a beneficiary of dishonor, the issuer must state "whether [it] is holding the documents at the disposal of, or is returning

21

them to the [beneficiary]." First Bank does not dispute that it failed to provide LaBarge with this information when it notified LaBarge that it would not honor the presentation.

3.    Possible Exceptions to Preclusion Under UCP 400, Article 16(e)

Because First Bank failed to comply with the requirements of UCP 400, Article 16(d) when dishonoring LaBarge's presentation, UCP 400, Article 16(e) provides that, it "shall be precluded from claiming that the documents are not in accordance with the terms and conditions of the credit." (See note 11 supra.) However, pertinent case law suggests two possible exceptions to this preclusion requirement.

a.    Presentation of documents with known defects

LaBarge did not and apparently could not strictly comply with the terms of the letter of credit when presenting it because it did not have the original credit.  Furthermore, it had previously been told by First Bank that the presentation would not be honored absent this essential document.  Thus, LaBarge may have knowingly presented discrepant documents to First Bank.[15] The district court held that because LaBarge knowingly presented an improper document when making its presentation to First Bank, the preclusion provision of Article 16(e) should not be enforced in this case.

The district court's decision was guided by Philadelphia Gear, a Fifth Circuit case in which Louisiana law applied, as it does here.  717 F.2d 230.  In

---

[15] LaBarge argues that it did not knowingly present discrepant documents because it thought that the facsimile copy of the letter of credit successfully could be presented.  First Bank disputes this contention, arguing that LaBarge knew at the time it requested the draw that the original credit was required as demonstrated by the fact that, among other things, LaBarge wrote in its indemnification proposal that it included in its presentation that the "original letter of credit" could not be produced because it was not delivered to LaBarge and was lost or destroyed.  We note that it is clear that First Bank then knew LaBarge was presenting a facsimile and that LaBarge then knew that First Bank knew this and LaBarge took the position that the facsimile sufficed, knowing that First Bank took the position it did not.  However, as we hold that whether LaBarge knowingly presented discrepant documents is immaterial, we will not now address this particular issue.

that case, the beneficiary knowingly presented discrepant documents in an attempt to draft on a letter of credit. Id. at 238. The issuing bank timely notified the beneficiary that the documents did not comply with the terms of the credit, but did not specify the defects on which it based the dishonor. Id. at 233. The issuer also did not return the documents to the beneficiary or inform the beneficiary that it would hold the documents on file for inspection. Id. The district court held that the issuer was estopped from raising the documents' deficiencies as a defense because it violated the 1974 revision of the UCP (UCP 290) by failing to return the documents or notify the beneficiary that they were being held at the issuer's disposal. Id. On appeal, this court held that with respect to the drafts that the beneficiary knew to be defective, the issuer's notice was not deficient. Id. at 237. It held that because a beneficiary knowingly presented defective documents, the issuer was not required by the UCP to notify the beneficiary of the precise reasons it would not accept the nonconforming documents when it dishonored the beneficiary's request to draw. Id. at 238. We there stated that "[i]t would be a strange rule indeed under which a party could tender drafts containing defects of which it knew and yet attain recovery on the ground that it was not advised of them." Id.

The district court improperly concluded that Philadelphia Gear applies to this case. Philadelphia Gear is distinguishable from the present case in multiple respects. First, the letter of credit at issue in Philadelphia Gear was subject to the UCP 290, not the UCP 400, and the two versions of the UCP differ significantly.[16] See id. at 233. Under UCP 290, when dishonoring a draw, an

---

[16] The relevant provisions of UCP 290, Article 8 state:
"(c) If, upon receipt of the documents, the issuing bank considers that they appear on their face not to be in accordance with the terms and conditions of the credit, that bank must determine, on the basis of the documents alone, whether to claim that payment, acceptance or negotiation was not effected in accordance with the terms and conditions of the credit.

issuer is not required, as it is under UCP 400, to "state the discrepancies in respect of which [it] refuses the documents." UCP 400, Article 16(d). Instead, under UCP 290 the issuer must to give notice to the beneficiary of dishonor "stating the reasons therefor." UCP 290, Article 8(e). The Philadelphia Gear court refused to find a requirement that upon dishonor, the issuer should identify specific discrepancies in a presentation where such a requirement did not exist in UCP 290. Philadelphia Gear, 717 F.2d at 237. However, this case involves a violation of a clear rule that issuers must follow when dishonoring a presentation. LaBarge is not requesting that this court imply a rule that is not explicitly stated in the UCP 400, but only that it enforce the clear language of Article 16(d) and (e).

Next, Philadelphia Gear did not involve "strict preclusion" language like that found in UCP 400, Article 16(e). Article 8(f) of UCP 290 applies similar preclusion language only when the issuer does not hold the documents at the disposal of the remitting bank or return the documents to the remitting bank. The UCP 290 preclusion language does not apply when an issuer does not state the reasons for dishonoring a draw. In Philadelphia Gear, the problems with the issuer's notice of dishonor were that it did not inform the beneficiary of the precise reasons it considered the presented documents to be nonconforming and

---

(d) The issuing bank shall have a reasonable time to examine the documents and to determine as above whether to make such a claim.

(e) If such claim is to be made, notice to that effect, stating the reasons therefor, must, without delay, be given by cable or other expeditious means to the bank from which the documents have been received (the remitting bank) and such notice must state that the documents are being held at the disposal of such bank or are being returned thereto.

(f) If the issuing bank fails to hold the documents at the disposal of the remitting bank, or fails to return the documents to such bank, the issuing bank shall be precluded from claiming that the relative payment, acceptance or negotiation was not effected in accordance with the terms and conditions of the credit." Id. at 234.

24

that it did not return or inform the beneficiary or remitting bank that it would hold at the disposal of the remitting bank the drafts and supporting documents. 717 F.2d at 233. Thus, the court's decision to refuse to preclude the issuing bank from asserting the discrepancies because it did not advise the beneficiary of them did not involve the strict preclusion language set forth in the UCP 400. Instead, the court simply refused to estop the issuer from asserting document discrepancies as a basis for dishonor. Id. at 234, 238.

Philadelphia Gear is also distinguishable in that it relied on a presentation warranty that is no longer a part of Louisiana law. The court expressly relied on a former provision of the Louisiana Code that stated that in a presentation, the beneficiary warrants that its drafts conform to the terms of the credit. Id. at 238 (applying LA. REV. STAT. ANN. § 10:5-111 (1974)).

The pertinent warranty provision of the Louisiana code was changed in January 2000, and now states that "if its presentation is honored, the beneficiary warrants . . . to the issuer . . . and the applicant that there is no fraud or forgery of the kind described in [section] 10:5-109(a)." LA. REV. STAT. ANN. § 10:5-110(a)(1). Thus, now, a beneficiary provides no warranty under Louisiana law unless a presentation is honored, which it was not in this case. Furthermore, the warranty only promises no fraud or forgery, not that a presentation complies exactly with the terms of the credit. Therefore, unlike in Philadelphia Gear, the warranty of presentation cannot be used by First Bank in this case because First Bank did not honor LaBarge's presentation. LA. REV. STAT. ANN. § 10:5-110(a)(1).[17]

---

[17] As First Bank notes, Philadelphia Gear also relied upon a warranty of good faith which still applies to all transactions under Article 5. LA. REV. STAT. ANN. § 10:1-203 ("Every contract or duty within this Title imposes an obligation of good faith in its performance or enforcement."). Nonetheless, because the same presentation warranty no longer applies, Philadelphia Gear is distinguishable from this case. Moreover, there is no evidence of relevant lack of good faith on LaBarge's part. See note 15 supra.

At least two other circuits have refused to apply Philadelphia Gear. In Kerr McGee Chem. Corp. v. F.D.I.C., 872 F.2d 971, 973-74 (11th Cir. 1989), the Eleventh Circuit refused to apply the holding of Philadelphia Gear because the letter of credit at issue in that case incorporated UCP 400 instead of UCP 290. It noted that the UCP 400 "provides that the bank must state its reasons for dishonor, and that failure to state these reasons will preclude a later claim of discrepancy." Id. at 974. Similarly, in Hamilton Bank v. Kookmin Bank, 245 F.3d 82, 92 (2d Cir. 2001), the Second Circuit refused to apply Philadelphia Gear in part because the letter of credit in Hamilton Bank incorporated UCP 500, which has preclusion language similar to that in UCP 400, Article 16(e). The court concluded that the preclusion rule "is mandatory and admits of no exception." Id. at 92. Thus, it rejected the holding of Philadelphia Gear.

Moreover, Voest-Alpine Trading USA Corp. v. Bank of China, 288 F.3d 262, 264 (5th Cir. 2002), a beneficiary knowingly presented discrepant documents when attempting to draft on a credit that incorporated UCP 500. The beneficiary and its advising bank knew of the defects in the documents it presented, but presented them in hopes that the applicant would waive these defects. Id. at 264. This court held that it would not reach the issue of whether the documents presented were proper because the issuing bank did not provide timely notice of dishonor, and was precluded from asserting that the documents did not conform to the terms of the credit. Id. at 267. Voest-Alpine did not even cite Philadelphia Gear. Moreover, we recognized in Voest-Alpine that beneficiaries often present defective documents to issuers when drawing on letters of credit in part because the applicant may waive the deficiencies in presentation. Id. at 266 (5th Cir. 2002) (quoting Alaska Textile, 982 F.2d at 824) ("as many as half of the demands for payment under letters of credit are discrepant, yet, in the vast majority of cases, the account party waives the discrepancies and authorizes payment."); WHITE & SUMMERS § 26-5(b).

For the reasons stated, we decline to apply *Philadelphia Gear* to this case by holding that a beneficiary cannot knowingly present defective documents and obtain recovery based on untimely and insufficient notice of dishonor by the issuer under UCP 400, Article 16(e).

### b. The Incurable Defect Exception

First Bank relies on *LeaseAmerica Corp. v. Norwest Bank Duluth*, 940 F.2d 345, 349-50 (8th Cir. 1991). In *LeaseAmerica*, as in this case, when dishonoring a request to draw, the issuing bank did not notify the beneficiary whether it was holding or returning the presented documents to the beneficiary. *Id.* at 349. The Eighth Circuit held that the failure of the bank to comply with that UCP 400, Article 16(d) requirement did not preclude it from dishonoring the draw because the defects in the beneficiary's presentation were not curable.[18] *Id.* ("LeaseAmerica cannot avoid the adverse results of an incurably defective compliance by invoking a strict compliance standard to the conduct of the Bank or by applying the provisions of the UCP [400]."). It explained that the language of UCP 400, Article 16(e) is meant to provide a beneficiary with the opportunity to cure defects in its presentation, so if the defects cannot be cured, the preclusion rule should not be enforced. *Id.* at 349-50.

This court made a similar statement in dicta in *Heritage Bank v. Redcom Laboratories, Inc.*, 250 F.3d 319, 327 (5th Cir. 2001), a case applying Texas law. In *Heritage Bank*, the issuing bank dishonored a letter of credit, but did not notify the beneficiary of the deficiencies in the presentation, which violated the preclusion rule of the UCP 500. *Id.* This court held that the issuing bank waived all discrepancies related to the presentation because it did not notify the beneficiary of the deficiencies, the defects could have been cured, and the beneficiary would suffer prejudice if it were not notified of the defects. *Id.* In

---

[18] The court observed that "Minnesota law applies to this case, but the parties have cited us no authority in point and we have found none." *Id.*

dicta, the court suggested, citing a Texas case, that it may have applied the incurable defect exception to the UCP 500 preclusion rule had the defect at issue in the presentation been incurable. Id. ("If the presentment were untimely, no cure would be possible, and the bank had no duty to notify Redcom of the defect."). But the court concluded that Redcom's presentment was timely, so Redcom could have cured any defects. Id.[19]

However, other courts have rejected the incurable defect exception to the preclusion rule and have held that the preclusion rule should be strictly enforced. See Toyota Tsusho Corp. v. Comerica Bank, 929 F. Supp. 1065, 1073 (E.D. Mich. 1996) (referring to the preclusion rule of UCP 400, Article 16(e) as "strict preclusion"). Under the strict preclusion theory of UCP 400, Article 16(e), if an issuer does not comply with the terms of Articles 16(c) and (d), it is automatically precluded from asserting its right to offer valid grounds for rejecting a presentation. Id. The beneficiary need not demonstrate "detrimental reliance or ability to cure" the deficiencies in the documents in order for Article 16(e) preclusion to apply. Id. at 1073-74 (declining to apply Lease-America). See also Hamilton Bank, 245 F.3d at 92 (stating that the preclusion rule set forth in UCP 500, Article 14(e) presents "mandatory" language that "admits of no exception"); Amwest Sur. Ins. Co. v. Concord Bank, 248 F. Supp. 2d 867, 877 (E.D. Mo. 2003) ("To balance the rule of strict compliance, Article 14 [of UCP 500] provides for a rule of strict preclusion."); Banque de L'Union Hatienne v. Manufacturers Hanover Int'l Banking Corp., 787 F. Supp. 1416, 1423 (S.D. Fla.

---

[19] In Wing On Bank Ltd v. American National Bank & Trust, 457 F.2d 328 (5th Cir. 1972), a Florida law case, we held that the issuing bank's failure to timely notify of defects in the documents presented with the draw was immaterial because the beneficiary "failed to establish that it was prejudiced by the delay." Id. at 329. However the opinion does not indicate any of the relevant terms of the letter of credit respecting this issue other than to note that it was subject to some unspecified version of the UCP. As with UCP 290 (see note 16 supra), this pre-1968 UCP may have had no preclusion rule applicable to failure to give timely notice of defects in documents presented.

1991) (rejecting the plaintiff's argument that strict preclusion under Article 16(e) of UCP 400 does not apply when the defect in presentation is incurable).

We decline to apply the Lease-America incurable defect approach here. We note that in Lease-America notice of dishonor and of discrepancies was held timely given, but merely failed to also include a statement whether the issuer "was holding or returning the documents." Id. at 349. Here, there was not any timely notice of either dishonor or of the defects in the documents presented, in addition to a lack of notice of whether the issue was holding or returning the documents. Moreover, in Lease-America the attempt to draw was made on the last day, and the documents submitted reflected that the condition that the applicant have at least ten days notice of default before the draw was not met, so the incurable nature of the defect was then facially evident and certain. Here, however, the attempted draw was made on Monday, February 17 and the letter of credit remained valid on February 23, so it was not necessarily or facially impossible on February 17 for the original letter to have been found and timely submitted.

More importantly, we conclude that the Louisiana courts would not adopt the incurable defect exception. While we realize that what is ultimately controlling here, by virtue of LA. REV. STAT. ANN. § 10:5-116(c) (see note 6, supra), is UCP 400 Article 16(d) and (e) (see note 11 supra), nevertheless the post Lease-America revision of UCC Article 5 reflected in LA. REV. STAT. ANN. 10:5-108, made effective January 1, 2000, plainly indicates the legislative intent to apply a rule of strict preclusion, rather than prejudice to the beneficiary, in respect of the issuer's failure to timely give notice of dishonor and defects in the presentation. R.S. 10:5-108(c) provides:

> "(c) Except as otherwise provided in Subsection (d) [relating to fraud, forgery and expiration of the letter before presentation], an issuer is precluded from asserting as a basis for dishonor any

discrepancy if timely notice is not given, or any discrepancy not stated in the notice if timely notice is given."

The UCC comment to this amendment of Article 5 (which appears in West's Louisiana Revised Statutes just following R.S. 10:5-108) includes the following:

"3.   The requirement that the issuer send notice of the discrepancies or be precluded from asserting discrepancies is new to Article 5.  It is taken from the similar provision in the UCP and is intended to promote certainty and finality.

The section thus substitutes a strict preclusion principle for the doctrines of waiver and estoppel that might otherwise apply under Section 1-103.  It rejects the reasoning in Flagship Cruises Ltd. v. New England Merchants' Nat. Bank, 569 F.2d 699 (1st Cir. 1978) and Wing on Bank Ltd. v. American Nat. Bank & Trust Co., 457 F.2d 328 (5th Cir. 1972) where the issuer was held to be estopped only if the beneficiary relied on the issuer's failure to give notice.

Assume, for example, that the beneficiary presented documents to the issuer shortly before the letter of credit expired, in circumstances in which the beneficiary could not have cured any discrepancy before expiration.  Under the reasoning of Flagship and Wing On, the beneficiary's inability to cure, even if it had received notice, would absolve the issuer of its failure to give notice.  The virtue of the preclusion obligation adopted in this section is that it forecloses litigation about reliance and detriment."

As the language of UCP 400 Article 16(d) and (e) does not on its face suggest an incurable defect exception and the jurisprudence is divided, we believe that the Louisiana courts would not apply such an exception.  We also observe that WHITE & SUMMERS cites Lease-America as an example of decisions "to require some level of detrimental reliance on the beneficiary's part before finding preclusion," id. § 26-8 at 193 & n.6, and goes on to state that "In the previous edition of this treatise, we argued that such holdings were incorrect, and the new

provisions on strict preclusion in the UCC and UCP indicate that the drafters agreed." Id. at 193.[20]

First Bank is strictly precluded by UCP 400 Article 16(e) from raising the defects in LaBarge's presentation. The district court's judgment in favor of First Bank on LaBarge's claim against it under the letter of credit is reversed and the case is remanded for the district court to enter judgment in favor of LaBarge on that claim. The court should award LaBarge the amount of its draw on the letter of credit, namely $143,613.40, plus any appropriate legal interest under Louisiana law, less any payments made by PVF to LaBarge for the purchase of the pipe.[21] The district court should also award LaBarge its attorney's fees and other litigation expenses on its letter of credit claim (but not its other claims) under LA. REV. STAT. ANN. § 10:5-111(e).

## E.   Detrimental Reliance and Negligent Misrepresentation Claims

---

[20] See also the following from WHITE & SUMMERS concerning current UCP provisions comparable to UCP 400 sections 16(d) & (e), viz:

"In effect, these sections are the quid pro quo for the strict compliance requirements. While the beneficiary must strictly comply in its presentation, so too must the issuer give notice of the deficiencies in a prescribed manner or forever waive the right to raise the issue of defective presentation. These notice requirements are an offsetting balance for the strict compliance requirements." Id.

In the referenced previous (4th) edition of WHITE & SUMMERS, the following passage appears (§ 26-9(b)) in the discussion of Lease-America:

"[The doctrine] that preclusion does not apply if beneficiary would be unable to cure is an equitable encroachment on the strict rules of the UCP. Courts should not be invited to ignore preclusion rules whenever notice by the issuer could not cure. 'Preclusion' is different from an 'estoppel' that would be dependent on reliance; 'preclusion' is a strict rule requiring no reliance and designed to make life simple for beneficiaries, issuers and courts." Id.

[21] LaBarge admits that PVF has paid it a portion of the debt it owes LaBarge for the pipe. In PVF's proposed bankruptcy plan, filed in October 2003, PVF is to pay the said entire then remaining debt to LaBarge, and has apparently issued LaBarge a note for that amount on which PVF has made some payments. The district court should also consider whether to make any provision respecting that note and if so, what.

Based on the alleged misleading statements that David made to Mannhard regarding LaBarge's security under the letter of credit on November 26, 2002, LaBarge brings a claim against First Bank for detrimental reliance[22] and one for negligent misrepresentation against both First Bank and David. The district court properly granted summary judgment against LaBarge on both of these claims.

As an element of these claims, LaBarge must prove that it reasonably or justifiably relied on First Bank's alleged statements and assurances. Detrimental reliance is defined under LA. CIV. CODE ANN. art. 1967 (2008), which states that "[a] party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying" (emphasis added). To recover for negligent misrepresentation, a plaintiff must establish (1) the defendant supplied false information in the course of business, (2) the defendant had a legal duty to supply the plaintiff with correct information, (3) the defendant breached this duty, and (4) the plaintiff suffered damages "as a result of its justifiable reliance" on the misrepresentation. Sys. Eng'g and Sec., Inc. v. Sci. & Eng'g Asscs., Inc., 962 So.2d 1089, 1092 (La. Ct. App., 4th Cir., 2007) (emphasis added).

The district court properly granted summary judgment for First Bank on these two LaBarge claims on the grounds that it was not reasonable or

---

[22] In its complaints, LaBarge lists a claim for detrimental reliance. The district court also refers to "LaBarge's detrimental reliance/equitable estoppel claim." However, the language of LaBarge's brief suggests that it makes both an equitable estoppel and a detrimental reliance claim. This is misleading because it appears that under Louisiana law "equitable estoppel" is simply another name for detrimental reliance, and the terms are used interchangeably. See Prime Income Asset Mgmt., Inc. v. Tauzin, 981 So.2d 897, 905 (La. Ct. App. 2008) (indicating that detrimental reliance is "a form of equitable estoppel"); Garber v. Badon & Ranier, 981 So.2d 92, 105 (La. Ct. App. 2008) (indicating that detrimental reliance is "also known as equitable estoppel"). We will refer to LaBarge's claim as the "detrimental reliance" claim.

justifiable for LaBarge to rely on the alleged statements made by David. The evidence conclusively establishes that LaBarge cannot prove at least one of the elements of each of these two claims against First Bank. See Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986). LaBarge should have known that it should rely on the terms of the credit instead of oral representations from First Bank representatives in determining whether to ship the pipe. The terms of the letter of credit explicitly required the original to be presented for payment. Furthermore, LaBarge is a well-established company with vast experience in the business of shipping pipe. It does not argue that it is not familiar with letters of credit or that it has not used them before. Thus, LaBarge should have known that it could not reasonably rely on statements made by a First Bank employee when those statements contradicted the express terms of the letter of credit. Furthermore, LaBarge's assertion of these two claims against First Bank is an attempt to bypass the laws governing letters of credits.

Because LaBarge was not reasonable or justified in relying on the alleged misrepresentations made by a First Bank employee, it cannot establish an essential element of each of these two claims against First Bank and David. Therefore, we hold that the district court properly granted summary judgment against LaBarge on its detrimental reliance and negligent misrepresentation claims.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed in part, and reversed and remanded in part for further proceedings as called for herein and otherwise as not inconsistent with this opinion.

AFFIRMED in part, REVERSED and REMANDED in part

for further proceedings.